**DATA GENERAL CORPORATION, Appellant,**

v.

**Roger W. JOHNSON, Administrator, General Services Administration, Appellee,**

and

**International Business Machines Corporation, Intervenor.**

No. 95–1208.

United States Court of Appeals, Federal Circuit.

Feb. 29, 1996.

Rehearing Denied; Suggestion for Rehearing In Banc Declined May 7, 1996.

Richard J. Webber, Arent Fox Kintner Plotkin & Kahn, Washington, D.C., argued, for appellant.

Dean L. Grayson, Attorney, Commercial Litigation Branch, Department of Justice, Washington, D.C., argued, for appellee. With him on the brief were Frank W. Hunger, Assistant Attorney General and David M. Cohen, Director. Also on the brief were George Barclay, Michael Ettner, Roger Waldron, Pamela Reiner and Jody Burton, Office of General Counsel, General Services Administration, of counsel.

Thomas Humphrey, Crowell & Moring, Washington, D.C., argued, for intervenor. With him on the brief were L. Graeme Bell, III, Devon S. Engel and Jacqueline E. Hand, of counsel.

Before NEWMAN, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and SCHALL, Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge FRIEDMAN.

Dissenting opinion filed by Circuit Judge NEWMAN.

FRIEDMAN, Senior Circuit Judge.

The appellant, Data General Corporation (Data General), challenges the decision of the General Services Administration (GSA) Board of Contract Appeals (Board), denying its protest of GSA's award of a contract to International Business Machines Corporation (IBM). *Data Gen. Corp. v. General Servs. Admin.*, GSBCA 13092–P, 13098–P, 1995 Board Cont. Appeals Bid Protest Decisions (Federal Publications Inc.) ¶ 48, 1995 WL 80010 (Feb. 6, 1995). The principal issue is whether the Board correctly held that Data General was not entitled to relief because it did not show that it had suffered prejudice as a result of any alleged improprieties in the procurement process. We affirm.

### I.

In 1992, GSA solicited proposals to provide extensive automatic data processing equipment and related supplies and services for the United States Forest Service. *Id.* at 3.

The solicitation stated that the proposals would be separately evaluated with respect to technical and cost factors. The technical evaluation would be based upon four items, each of which was further subdivided. *Id.* The solicitation stated that the agency's source selection authority " 'will determine the proposal which provides the best overall value to satisfy Government needs' " and that the technical assessment would be "significantly more important" than cost. *Id.* at 4.

GSA designated five companies that submitted proposals as within the competitive range. *Id.* at 4–5. These companies were IBM, Data General, Hewlett–Packard, GDE Systems, Inc. (GDE), and Digital Equipment Corporation (Digital). Each of them had further discussions with GSA, and then submitted its best and final offer (BAFO). *Id.* at 5–6.

Upon review of the companies' submissions, a GSA contracting officer noted several pricing discrepancies in IBM's BAFO. *Id.* at 6–8. Specifically, the tables showing special pricing provisions (B tables) provided for beginning dates for two discounts that differed from the dates indicated in another table that showed expected contract life cycle cost (L table) and in the automated files IBM submitted with its BAFO. *Id.* at 8. The beginning dates of these discounts had a substantial effect on the overall cost of the proposal.

The contracting officer by telephone requested IBM to give two yes-or-no answers about what the dates should be:

Question 1:

[Redacted]

Your B–Table, special pricing provision, states that the effective date for the first discount is 1 Oct [redacted].

Your automated files are based on an effective date beginning 1 Oct [redacted] (Fiscal year [redacted] ).

Should special pricing provision state that the effective date for the first discount is 1 Oct [redacted] (Fiscal year [redacted] )?

Yes or No

Question 2:

[Redacted]

B–Table, special pricing provisions, state that the effective date for the first discount is 1 Oct [redacted].

Your automated files are based on an effective date beginning Feb [redacted].

Should special pricing provision state that the effective date for the first discount is 1 Oct [redacted] (Fiscal year [redacted])?

Yes or No

*Id.* at 8–9. IBM orally answered the first question "no" and the second question "yes." Later the same day, however, IBM changed its answer to the first question to "yes." *Id.* at 9. The final answers resulted in a substantially lower overall contract cost than would have resulted under the dates stated in the B tables.

Applying the revised beginning-discount dates to IBM's proposal, GSA then compared the BAFOs of the five companies with respect to both the cost and the technical areas. Data General's BAFO was substantially higher than IBM's. Data General's technical score was slightly higher than IBM's. Although the GSA source selection authority deemed the technical area "significantly more important than the Cost Area," *id.* at 10, it concluded that "IBM provides the best overall value to satisfy the Government's needs." *Id.*

GSA awarded the contract to IBM in June 1994. *Id.*

Digital then filed a protest with the Board challenging the award on various grounds. GDE and Data General intervened on the side of the protester, but Data General later voluntarily withdrew its intervention. *Id.* at 10–11. While the protests were pending, the government supplemented the analysis supporting the award with a cost/technical trade-off report. *Id.* at 10. This report, dated July 28, 1994, " 'is to provide additional detail to the items considered in doing the price vs. technical tradeoff for the SSAC [Source Selection Advisory Council].' The report elaborates upon quantifiable and non-quantifiable differences between IBM and the then-parties to the protest, D[igital] and GDE. The report calculates the projected additional costs to the Forest Service over the life of the contract for implementing the systems of

D[igital] and GDE as opposed to those of IBM." *Id.* at 10–11 (citation omitted).

On August 5, 1994, GSA moved to dismiss the protest. The motion stated:

GSA stipulates that the contract [with IBM] was awarded in violation of Federal Acquisition Regulation § 15.612(d). GSA stipulates that Digital and GDE have succeeded as to a significant issue and should be deemed the prevailing parties and awarded reasonable and documented attorney fees and costs of pursuing the protests.

*Id.* at 11.

The Board dismissed the protest with prejudice, stating that "[n]o party has asked to submit the matter on the record," "introduced an admission which would enable the Board to grant the protest," or "suggested an alternate resolution given the state of proceedings and of the procurement. No party has offered a basis to deny the motion to dismiss with prejudice." *Id.*

GSA then terminated the contract with IBM "for the Government's convenience." *Id.* It issued to the five companies, effective October 6, 1994, an amendment to the solicitation which provided for a second set of proposals, negotiations and BAFO submissions. *Id.* at 11–12. This amendment led to renewed protests by four of the five companies, including Data General. GSA withdrew the amendment and the protests were dismissed on November 10, 1994. *Id.* at 12.

On November 23, 1994, GSA "reinstated" the contract it had awarded to IBM in the original procurement. *Id.* at 13. The GSA source selection authority testified that that decision "was based on the initial comparative best value analysis contained in the June 14, 1994 Source Selection Advisory Council Analysis Report as supplemented by the July 28, 1994 Cost/Technical Tradeoff Report."

Following the reinstatement, on November 30, 1994, Data General filed the protest that is the subject of this case. *Id.* at 2. The protest challenged the reinstatement of the contract on two grounds: First, the inquiry by the contracting officer to IBM about the beginning date of the discounts after the submission of BAFOs was an impermissible

"discussion" that allowed IBM to revise its BAFO without giving the other companies an opportunity to do so. Second, GSA should be estopped from denying that it violated 48 C.F.R. § 15.612(d) (1994), as it had admitted during the first round of protests, and that as a result the reinstatement was illegal.

The Board rejected both arguments. It held that "[a]ny improprieties in the clarification/discussion process have not prejudiced [Data General]. Accordingly, the agency was not required to reopen discussions prior to award." *Data Gen. Corp.*, 1995 Board Cont. Appeals Bid Protest Decisions (Federal Publications Inc.) at 17. The Board further ruled that GSA was not estopped from denying illegality in the reinstatement of the contract "[b]ecause the earlier stipulation does not demonstrate an agency violation of statute or regulation in its November actions." *Id.* at 15. The Board stated that "the position of the agency in the stipulation is not inherently inconsistent with its position in this protest," because "[a]t issue in the first protest was the propriety of the selection and 'best value' determination regarding IBM compared to D[igital] and GDE," not compared to Data General. *Id.*

## II.

■ Both the government and IBM contend that the part of Data General's protest that challenges GSA's telephonic inquiry to IBM regarding the beginning date of IBM's discounts was untimely under the Board's regulations and that the Board therefore had no jurisdiction over it. They rely on a Board regulation stating that protests of this type must "be filed no later than 10 working days after the basis for the ground of protest is known or should have been known." 48 C.F.R. § 6101.5(b)(3)(ii) (1994). They contend that because Data General knew, or should have known, of the allegedly illegal contacts more than 10 days prior to its filing of this protest, i.e., during the prior protest proceedings, the regulation barred the Board from considering that part of the protest.

In denying the motion to dismiss the Board stated:

Neither protester is here objecting to the initial selection of IBM as the awardee. . . .

Each protester is here objecting to the recent agency action: the determination in November to "reinstate" the IBM award. Parts of the existing protests also challenge what purport to be agency actions upon which this selection determination rests. Even if the identical actions preceded the initial "award" to IBM, those actions are now placed in the new context of the recent adverse agency action, the reselection of IBM.

.   .   .   .

The protests have been filed within ten calendar days of the adverse agency action.

*Data Gen. Corp. v. GSA,* GSBCA Nos. 13092–P, 13098–P, 95–1 B.C.A. (CCH) ¶ 27,-552, at 137,304, 1994 WL 762525 (Dec. 8, 1994), (citing 48 C.F.R. § 6101.5(b)(3)(ii) (1994)) (footnote omitted).

We have no reason to reject that ruling of the Board.

Even assuming *arguendo* that, as the government and IBM assert, Data General became aware of the communications between GSA and IBM during the prior protest proceedings, those proceedings challenged only the initial award of the contract to IBM in June 1994. GSA terminated that contract in the summer of 1994, however, after the Board had dismissed the protest with prejudice. If Data General had raised in that earlier protest proceeding its present contention regarding the communications between GSA and IBM, the Board's dismissal of that protest would have mooted both Data General's protest and the issue. After those actions by the Board and GSA, there no longer existed any agreement between GSA and IBM.

Data General's present protest challenges GSA's reinstatement of the award to IBM on November 23, 1994. As stated in its request for relief in its opening brief here, Data General asks this court to "direct the government to terminate the IBM contract and to reopen the procurement for discussion and new best and final proposals." In other words, it seeks to reverse GSA's reinstatement of the award to IBM. That reinstate-

ment occurred on November 23, 1994, and the protest, filed 7 days later, was within the 10 day limit for filing protest under the Board's regulation.

"[A]n agency's interpretation of its own regulations is normally entitled to considerable deference," *Perry v. Martin Marietta Corp.,* 47 F.3d 1134, 1137 (Fed.Cir.1995) (citing *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–02, 13 L.Ed.2d 616 (1965)), and that interpretation ordinarily will be accepted "unless it is plainly erroneous or inconsistent with the regulation," *Honeywell Inc. v. United States,* 228 Ct.Cl. 591, 661 F.2d 182, 186 (1981). These principles apply to the Board's ruling here that Data General's protest met the time requirements under the Board's regulation. The Board did not abuse its discretion in concluding that the requirement that a protest must be filed within 10 days "after the basis for the ground of protest is known or should have been known," 48 C.F.R. § 6101.5(b)(3)(ii) (1994), was satisfied because the protest was filed within 10 days of the action being protested, namely, the reinstatement of the award to IBM, even though the ground of that protest also would have been available to challenge the prior award to IBM.

### III.

■ Once bidders have submitted their BAFOs, the government may seek "clarification" of a bid, but cannot engage in "discussion" with a particular bidder. *See SWD Assocs. Ltd. Partnership v. United States Gen. Servs. Admin.,* 34 Cont.Cas.Fed. (CCH) ¶ 75,468, at 81,514 & n. 2, 1988 WL 242629 (D.D.C. Mar. 31, 1988); *Fortran Corp. v. Department of Transp.,* GSBCA 12952–P, 1994 Board Cont. Appeals Bid Protest Decisions (Federal Publications Inc.) ¶ 245, at 6, 1994 WL 589482 (Oct. 27, 1994) (if the agency wished to allow an offeror "to modify its proposal after BAFOs, it was required, pursuant to FAR 15.611(c), to afford the same opportunity to the other offerors") (citing 48 C.F.R. § 15.611(c) (1994)); *see also* S.Rep. No. 50, 98th Cong., 2d Sess. 24 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2174, 2197 ("Once discussions are held and best and final offers are received, agencies are not

permitted to conduct further discussion beyond minor clarifications, unless it is in the government's interest to reopen discussions and solicit another round of best and final offers."). The rule is designed to prevent a bidder from gaining an unfair advantage over its competitors by making its bid more favorable to the government in a context where the other bidders have no opportunity to do so. *See In re University of S.C.,* B–240208, 90–2 Comptroller Gen.'s Procurement Decisions (Federal Publications Inc.) ¶ 249, at 3 (Sept. 21, 1990) ("This rule applies ... because all offerors are entitled to an equal opportunity to revise their proposals.").

The Federal Acquisition Regulations explain the difference between "clarification" and "discussion." Clarification

> means communication with an offeror for the sole purpose of eliminating minor irregularities, informalities, or apparent clerical mistakes in the proposal.... Unlike discussion (see definition below), clarification does not give the offeror an opportunity to revise or modify its proposal, except to the extent that correction of apparent clerical mistakes results in a revision.

48 C.F.R. § 15.601 (1994). Discussion, on the other hand,

> means any oral or written communication between the Government and an offeror (other than communications conducted for the purpose of minor clarification), whether or not initiated by the Government, that (a) involves information essential for determining the acceptability of a proposal, or (b) provides the offeror an opportunity to revise or modify its proposal.

*Id.*

In its protest Data General argued—an argument it repeats here—that GSA's communications with IBM regarding the beginning date for its price discounts constituted "discussion" and not mere "clarification," and that this discussion invalidated the ensuing award to IBM and required GSA to conduct a new procurement. The Board did not reach that issue, however, because it concluded that "[a]ny improprieties in the clarification/discussion process have not prejudiced [Data General]." *Data Gen. Corp.,* 1995

Board Cont. Appeals Bid Protest Decisions (Federal Publications Inc.) at 17. We agree.

■ As Data General recognizes, to prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it. *See LaBarge Prods., Inc. v. West,* 46 F.3d 1547, 1556 (Fed.Cir.1995) ("Even though the disclosures to Victaulic clearly violated the FAR.... LaBarge was not harmed by the disclosures in any concrete way contemplated by the FAR and, therefore, is not entitled to relief."); *Central Ark. Maintenance, Inc. v. United States,* 68 F.3d 1338, 1342 (Fed.Cir. 1995) (stating in a pre-award bid protest that "not all violations of statute and regulation are the same; only a 'clear and prejudicial' violation of a procurement statute or regulation warrants relief"); *Cleveland Telecommunications Corp. v. Goldin,* 43 F.3d 655, 659 (Fed.Cir.1994) (a possible regulatory violation "did not prejudice [pre-award bid protester] in any way and does not provide grounds for terminating the procurement"); *CACI Field Servs., Inc. v. United States,* 854 F.2d 464, 466 (Fed.Cir.1988) (aggrieved bidder in a pre-award bid protest "was required to prove at trial a 'clear and prejudicial' violation of a procurement statute or regulation"); *TRW Envtl. Safety Sys., Inc. v. United States,* 18 Cl.Ct. 33, 67 (1989) ("Generally, the requirement of proving prejudice prevents an unsuccessful bidder from overturning a contract award due to a harmless violation of a statute or regulation on the part of the government.").

To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract. *See, e.g., In re Management HealthCare Prods. & Servs.,* B–251503.2, 93–2 Comptroller Gen.'s Procurement Decisions (Federal Publications Inc.) ¶ 320, at 4 (Dec. 15, 1993) ("To establish prejudice, an offeror is not required to prove that it would have received the award but for the agency's improper action...."); *In re Manekin Corp.,* B–249040, 92–2 Comptroller Gen.'s Procurement Decisions (Federal Publications Inc.) ¶ 250, at 5 (Oct. 19, 1992) (same). Such a rule would make it virtually impossible for a protester ever to prevail, no matter how egregious the error in the procurement process. On the other hand, a showing of a mere possibility that the protester would have received the contract but for the error is inadequate to show prejudice. If that were sufficient, the requirement of prejudice would be virtually eliminated. The proper standard lies between these polarities.

There have been variations in the verbal formulation of what is necessary to show prejudice. *See CACI, Inc.–Fed. v. United States,* 719 F.2d 1567, 1574–75 (Fed.Cir.1983) (finding that to satisfy the minimum requirements for standing to sue, a disappointed bidder must show that "'there was a substantial chance that [it] would receive an award—that it was within the zone of active consideration'") (quoting *Morgan Business Assocs., Inc. v. United States,* 223 Ct.Cl. 325, 619 F.2d 892, 896 (1980)); *see also TRW Envtl. Safety Sys., Inc.,* 18 Cl.Ct. at 69 (finding that procurement defects adversely affected plaintiff's chances of selection and therefore that it had established prejudice); *TRW Inc.,* GSBCA No. 11309–P, 92–1 B.C.A. (CCH) ¶ 24,389, at 121,789, 1991 WL 175673 (Aug. 29, 1991) (holding that government's regulatory violation "does not itself necessarily entitle a protester to relief. In such situations, the Board must review the conduct of the procurement with heightened scrutiny to determine if the improper taint had any actual adverse effect on the procurement process."); *In re Diverco, Inc.,* B–259734, 95–1 Comptroller Gen.'s Procurement Decisions (Federal Publications Inc.) ¶ 209, at 3 (Apr. 21, 1995) ("[W]here no reasonable possibility of prejudice is shown or is otherwise evident from the record, our Office will not sustain a protest, even if a deficiency in the procurement is apparent."); *In re Colonial Storage Co.—Reconsideration,* B–253501.8, 94–1 Comptroller Gen.'s Procurement Decisions (Federal Publications Inc.) ¶ 335, at 2 (May 31, 1994) (same).

■ We think that the appropriate standard is that, to establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract.

This is a refinement and clarification of the "substantial chance" language of *CACI, Inc.-Fed.*, 719 F.2d at 1574. The standard reflects a reasonable balance between the importance of (1) averting unwarranted interruptions of and interferences with the procurement process and (2) ensuring that protesters who have been adversely affected by allegedly significant error in the procurement process have a forum available to vent their grievances.

■ On this record, Data General has failed to show that the communications between GSA and IBM prejudiced it because it has not established that without these communications there was a reasonable likelihood that it would have been awarded the contract.

Data General first suggests that if, upon discovering the ambiguity in IBM's prices, GSA had not communicated with IBM but instead had awarded the contract based on IBM's higher B table prices, Data General had a reasonable possibility of receiving the award instead of IBM. As we hold, however, to establish prejudice requires showing a reasonable likelihood, not just a reasonable possibility.

Even under IBM's higher table B prices, Data General's price was still substantially higher than IBM's. GSA's source selection authority testified that even if he had evaluated the BAFOs on the basis of the higher B table prices, "his selection determination would not have change[d] because he did not deem the technical advantages of the Data General BAFO to offset the different in price." *Data Gen. Corp.*, 1995 Board Cont. Appeals Bid Protest Decisions (Federal Publications Inc.) at 13; *see also Caelum Research Corp. v. Department of Transp.*, GSBCA Nos. 13139–P, 13155–P, 13156–P, 95–2 B.C.A. (CCH) ¶ 27,733, at 138,265, 1995 WL 331795 (Apr. 13, 1995) (finding lack of prejudice where protester did "not demonstrate[ ] that the inclusion of the post-BAFO information impacted the selection" and where the selection officer's testimony indicated that the post-BAFO information did not affect the selection decision). We agree with the Board's conclusion: "The record does not suggest that the quantifiable and non-quantifiable discriminators between the Data General and IBM BAFOs could reasonably offset the price difference so as to make the selection of IBM improper." *Data Gen. Corp.*, 1995 Board Cont. Appeals Bid Protest Decisions (Federal Publications Inc.) at 16.

Data General next contends that instead of communicating with IBM, GSA could have reopened discussions with and obtained new BAFOs from all five bidding companies, either at the time of its communications with IBM or prior to the reinstatement of the award to IBM. Had GSA reopened discussions during the original procurement, Data General would not have known of IBM's lower price and therefore would have had no reason to reduce its own price. Although following the original award, Data General may have obtained additional information regarding IBM's price, Data General presented no evidence—not even a company executive affidavit—that at any time it would have reduced its price to compete more effectively with IBM.

The unsupported assertion in Data General's reply brief that "Data General had every incentive to lower its proposal price to the maximum extent possible" is inconsistent with its admission there that it "pursued a strategy of providing a higher performance solution at a higher cost." *See Caelum Research Corp.*, 95–2 B.C.A. (CCH) at 138,263 (holding of no prejudice based in part on fact that the protester had not "demonstrated that it could have improved its proposal in any material way so as to raise its score or increase its advantage"); *In re Maritime Management, Inc.*, B–260311.2, B–260311.3, 95–2 Comptroller Gen.'s Procurement Decisions (Federal Publications Inc.) ¶ 11, at 7–8 (July 11, 1995) ("Here, even if the communication constituted post-BAFO discussions, the protester has not shown that similar discussions with it would have possibly affected its standing for award.... The firm does not state—nor does the record suggest ... that it would have lowered its substantially higher price to such an extent (*i.e.*, by at least approximately 28 percent), to have reasonably put the firm in line for award had the protester been included in another round of discussions. Accordingly, MMI has not

shown the requisite prejudice to sustain the protest issue."); *In re Diverco, Inc.,* 95–1 Comptroller Gen.'s Procurement Decisions (Federal Publications Inc.) at 4 (finding no prejudice where "the protester does not state, nor does the record otherwise show, that Diverco could or would have lowered its price sufficiently to be in line for award had discussions been conducted").

Data General's situation closely parallels the protester's position in *Fortran Corp.,* 1994 Board Cont. Appeals Bid Protest Decisions (Federal Publications Inc.) ¶ 245, in which the Board stated:

> Although the FAA's actions were improper, Fortran was not prejudiced by those actions. Executone's offer of $4,397,132.28 was $3,271,710.42, or about 43 percent, less than Fortran's fourth lowest offer of $7,668,842.70. Fortran knew that the lowest-priced acceptable offer would win the contract, but made a business decision to offer a high-priced telephone system.... Now, knowing the winning price and that it cannot win with its proposed system, Fortran asks the Board to order the FAA to call for a new round of BAFOs....

> But Fortran lost the procurement not because the FAA failed to call for a second round of BAFOs, but because Fortran made a poor business decision to offer an expensive system. If, during the procurement, the FAA had called for a new round of BAFOs, Fortran, not knowing that the lowest-priced offer was more than $3,000,-000 (or 43 percent) lower than its own offer, could never have beaten Executone's price. Fortran's proposed system (the only one with which it had the required installation experience) was simply too expensive.

> ... By asking the Board to order the FAA to call for a new round of BAFOs, Fortran is attempting to use the protest system to obtain an undeserved "second bite at the apple" by correcting a problem which had no effect whatsoever on Fortran's chances of winning the original contract. The protest process was never intended to be used in this manner.

*Id.* at 7 (citation omitted); *see also In re Maritime Management, Inc.,* 95–2 Comptroller Gen.'s Procurement Decisions (Federal Publications Inc.) at 7–8.

■ Finally, Data General suggests that GSA could and should have disqualified IBM because of the discrepancies in its pricing tables. We know of no principle or precedent, however, that requires or even suggests disqualifying an otherwise qualified bidder because of inconsistencies in its quoted prices. The way to deal with that problem is to seek clarification of those prices, not to punish the bidder by disqualifying it. Data General's disqualification suggestion is not a tenable basis for its claim of prejudice.

## IV.

■ Data General argues that under the doctrine of judicial estoppel, the Board should have invalidated the reinstatement of the award to IBM because, in the earlier protest proceeding, GSA had "stipulate[d] that the contract [with IBM] was awarded in violation of Federal Acquisition Regulation § 15.612(d)." *Data Gen. Corp.,* 1995 Board Cont. Appeals Bid Protest Decisions (Federal Publications Inc.) at 11. That regulation provides:

> (d) *Source Selection Decision.* The source selection authority shall use the factors established in the solicitation (see 15.605) to make the source selection decision.

> (1) The source selection authority shall consider any rankings and ratings, and, if requested, any recommendations prepared by evaluation and advisory groups.

> (2) The supporting documentation prepared for the selection decision shall show the relative differences among proposals and their strengths, weaknesses, and risks in terms of the evaluation factors. The supporting documentation shall include the basis and reasons for the decision.

48 C.F.R. § 15.612(d) (1994).

According to Data General, since the contract award that was reinstated was for the same contract originally awarded, the government's stipulation that the original award of that contract violated the above regulation

means that the re-award also violated that regulation and therefore was invalid.

The doctrine of judicial estoppel is that where a party successfully urges a particular position in a legal proceeding, it is estopped from taking a contrary position in a subsequent proceeding where its interests have changed. *Davis v. Wakelee,* 156 U.S. 680, 689, 15 S.Ct. 555, 558, 39 L.Ed. 578 (1895); *Wang Lab., Inc. v. Applied Computer Sciences, Inc.,* 958 F.2d 355, 358 (Fed.Cir. 1992). Judicial estoppel is designed to prevent the perversion of the judicial process and, as such, is intended to protect the courts rather than the litigants. *See e.g., Wang Lab., Inc.,* 958 F.2d at 359; *In re Cassidy,* 892 F.2d 637, 641 (7th Cir.), *cert. denied,* 498 U.S. 812, 111 S.Ct. 48, 112 L.Ed.2d 24 (1990); *see generally U.S. Philips Corp. v. Sears Roebuck & Co.,* 55 F.3d 592, 596–97 (Fed. Cir.) *cert. denied,* —— U.S. ——, 116 S.Ct. 567, 133 L.Ed.2d 492 (1995).

The decision whether to invoke judicial estoppel lies within the court's discretion, and a refusal to apply the doctrine is reviewed under the "abuse of discretion" standard. *See e.g., United States v. Garcia,* 37 F.3d 1359, 1366–67 (9th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1699, 131 L.Ed.2d 562 (1995); *Yanez v. United States,* 989 F.2d 323, 326 (9th Cir.1993); *In re Cassidy,* 892 F.2d at 642; *Scott v. Land Span Motor, Inc.,* 781 F.Supp. 1115, 1119 (D.S.C. 1991). Although the Board is not a court, we assume it has authority by analogy to apply the doctrine in an appropriate case. *Cf. Graybill v. United States Postal Serv.,* 782 F.2d 1567, 1571 (Fed.Cir.) (affirming application of another judicially-developed equitable doctrine, that of collateral estoppel, by the Merit Systems Protection Board because "the same principles of judicial efficiency which justify [its] application ... in judicial proceedings also justify its application in quasi-judicial proceedings") (citing *Chisholm v. Defense Logistics Agency,* 656 F.2d 42 (3d Cir.1981)), *cert. denied,* 479 U.S. 963, 107 S.Ct. 462, 93 L.Ed.2d 407 (1986); *Reynolds v. Commissioner,* 861 F.2d 469, 472–74 (6th Cir.1988) (affirming application of doctrine of judicial estoppel by the Tax Court despite its lack of general equitable powers). In this case, however, the Board did not abuse its discretion in declining to apply judicial estoppel to bar GSA from asserting the validity of the reinstatement of the award to IBM.

The Board pointed out that in the earlier protest proceedings it

did not reach or resolve the merits of the grounds of protest/intervention....

... At issue in the first protest was the propriety of the selection and "best value" determination regarding IBM compared to D[igital] and GDE. Neither D[igital] nor GDE is here objecting to the award; any impropriety which the agency may have committed with respect to those offerors need not have affected Data General.... Thus, the position of the agency in the stipulation is not inherently inconsistent with its position in this protest.

These protests do not focus upon the selection of IBM made in June; rather, the protests focus upon the propriety of the agency's action in November of "reselecting" IBM and earlier actions relied upon in support of that reselection.... [T]he earlier stipulation does not demonstrate an agency violation of statute or regulation in its November actions....

*Data Gen. Corp.,* 1995 Board Cont. Appeals Bid Protest Decisions (Federal Publications Inc.) at 15.

Moreover, in reinstating the award, GSA relied on additional information that it did not have when it made the original award. As the source selection authority testified, the reinstatement was "based on the initial comparative best value analysis" made in June 1994 "as supplemented by the July 28, 1994 Cost/Technical Tradeoff Report."

As the Board stated, the issue in the present protest of the reinstatement of the IBM contract is different from the issue in the prior protest proceeding, in which GSA stipulated that the regulation had been violated. Furthermore, the factual basis of GSA's action in the two instances was not the same. The Board did not abuse its discretion in declining to hold that GSA is judicially estopped from supporting the validity of the reinstatement of the contract.

## CONCLUSION

The decision of the Board of Contract of Appeals denying Data General's protest is *AFFIRMED.*

PAULINE NEWMAN, Circuit Judge, dissenting.

I respectfully dissent. After the contract with IBM was terminated, it could not simply be "reinstated." The government stated to the Board:

> GSA stipulates that the contract was awarded in violation of Federal Acquisition Regulation § 15.612(d).

When the agency determined that the procurement was fatally flawed, it terminated the contract for convenience, with accompanying costs including the costs of the protests. Whatever the reason for termination, the contract was voided. It could not simply be re-awarded as if nothing had happened.

The government cites 48 C.F.R. § 49.102(d) as its authority for "reinstating" the contract. However, that regulation contemplates reinstatement of a partially performed contract later determined to have been improvidently terminated. I do not read the regulation as allowing the government to re-award the same contract that it voided after admitting that it was illegally procured. To allow the agency to bypass the carefully regulated procurement process eviscerates the protections of the federal acquisition regulations.

The majority holds that since Data General's initial bid was significantly higher than that of IBM there was not a "reasonable likelihood" that Data General would have been the successful bidder in the initial procurement, and therefore that it can not prevail in its protest of this new award. However, that is not the issue of concern. First, after legal error has been shown in the procurement, the protester need not show that it was reasonably likely to have received the award, but only that it had a "substantial chance" of doing so. *CACI, Inc.–Fed. v. United States*, 719 F.2d 1567, 1574–75 (Fed. Cir.1983). After the government voided the initial award, there was no evidence whatsoever to suggest that Data General might not have succeeded in a new procurement. Indeed, the initially bid technology was already obsolete, and a new procurement could well have been bid on a different basis.

The re-award of the admitted illegal contract was irregular and improper, and prejudicial to the participants in the competition. Prejudice is a sound basis for protest. *See Greenleaf Distribution Services, Inc.*, B–221335, 86–1 CPD ¶ 422 (1986) (review board could not conclude that protester was not prejudiced when denied chance to revise its best and final offer and thus sustained the protest). Although the panel majority refers to *Fortran Corp. v. Department of Transportation*, GSBCA No. 12952–P, 95–1 B.C.A. (CCH) ¶ 27,350, 1994 WL 589482 (1994) as justification for the re-award without further procurement, in that case the Board found *no* possibility that the protester's price would have been the lowest in a new round of bids because the protestor would have had no additional information that would prompt it to lower its bid. Data General stresses that in a reprocurement it would have had the opportunity to adjust its price/technical tradeoff in order to be more competitive.

In my view the agency's admitted violation of law can not be simply ignored. The illegal procurement was terminated, and it is now irrelevant whether such action was necessary. The contract was over, and its immediate re-award, with no further procurement, was improper, and was validly protested by a competitor who had a substantial chance of success in a new procurement.