**ACRA, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 99–337C.**

United States Court of Federal Claims.

July 14, 1999.

George W. Thomas, Washington, D.C., for plaintiff. William J. Spriggs, of counsel.

Sean H. Lane, U.S. Department of Justice, Washington, D.C., with whom were Assistant Director Kathryn A. Bleecker, Director David M. Cohen, and Acting Assistant Attorney General David W. Ogden, for defendant. Sandra L. Guydon, Defense Logistics Agency, Philadelphia, PA, of counsel.

## OPINION [1]

FIRESTONE, Judge.

This post-award bid protest action comes before the court on the parties' cross-motions for judgment on the administrative record. Plaintiff, ACRA, Inc. ("ACRA") protests the

1. This Opinion was originally filed under seal on July 2, 1999, subject to review by the parties for material subject to a Protective Order. On July 12, 1999, the parties informed the Court that the Opinion did not disclose any protected information. Accordingly, the Opinion is released for publication on this date, July 14, 1999.

Defense Logistics Agency, Defense Distribution Center's ("Agency" or "defendant") award to The Horsley Company ("Horsley") of a contract for the management, services, and labor necessary to provide a High Density Bin Storage Material Handling System at the Defense Distribution Depot in San Joaquin, Tracy, California.[2] The issues for consideration include the following: (1) whether Horsley's phased implementation plan was properly awarded credit as an enhancement, or whether the Agency improperly relied on Horsley's phased implementation plan as an undisclosed evaluation factor; (2) whether the Agency erred in failing to conduct meaningful discussions with ACRA over its technical and management proposals; and (3) whether, even if the Agency erred in considering Horsley's phased implementation approach as an enhancement and in conducting discussions, ACRA was prejudiced by the error.

## FACTS

The facts are undisputed. On May 1, 1998, the Agency issued a solicitation for all services, management, labor, material, equipment, controls, and engineering necessary to provide a High Density Bin Storage Material Handling System at the Defense Distribution Depot in San Joaquin, Tracy, California. The Agency manages and operates a distribution depot for items purchased and stored for the military.

In order to assure the timely and efficient completion of the storage and handling system, the solicitation initially called for the system to be completed within 365 days following the date of a contract award.[3] The Agency emphasized the need for expeditious completion in section F of the solicitation, which specifically stated that "[t]he Government desires maximum acceleration of performance/completion of the contract provided such acceleration is at no additional cost to the Government."

In addition to wanting accelerated completion, the Agency also wanted to minimize disruption during construction. In fact, one of the stated contract objectives was to "minimize disruption/down time during system installation." In order to meet this objective, the solicitation instructed the contractor to:

Install as much of the new material handling system as possible prior to removing existing material handling systems/equipment's or impacting warehousing operations;

Minimize the amount of time between the removal of the existing material handling systems/equipment that impact distribution operations and installation completion;

Closely coordinate material handling and facility system installations/modifications with [Agency] personnel in order for them to continue distribution operations during installation.

Under the terms of the solicitation, offers were to be evaluated by the following criteria, in descending order of importance: (1) technical; (2) management; (3) cost/price. The technical and management areas were significantly more important than price, but the Agency reserved the right to perform trade-offs between technical, management, and cost/price.

With respect to the technical proposal, the solicitation identified five factors against which proposals would be evaluated:

Factor 1: Material Handling Equipment System Layout/Design;
Factor 2: in Shelving Storage Mechanical/Electrical Components;
Factor 3: Package/Tote Conveyor Mechanical/Electrical Components and Controls;
Factor 4: Equipment and Facilities Interfaces/Modification;
Factor 5: Software/Firmware Development and Documentation.

The technical proposal was to address not only what the offeror proposed to do but also "the approach to furnishing it." The solicitation also asked offerors to address any tech-

---

**2.** The original contract called for work to be done at two sites, located in Sharpe and Tracy, California. On January 25, 1999, the Agency issued an amendment that deleted the Sharpe site from the solicitation requirements, leaving only the Tracy site for evaluation and award.

**3.** As discussed, *infra,* this time was later cut back to 270 days.

nical enhancements in their proposals. An "enhancement" was defined in the solicitation to mean:

> any proposed change which performs the required function in a manner different from the RFP Specification/Scope of Work, but which results in better performance, safer operation, or lower cost at no sacrifice in performance.

With respect to the management proposal, the solicitation provided that offerors would be evaluated based on the following factors:

Factor 1: Master Program Management Plan;
Factor 2: Organization Structure;
Factor 3: Quality Assurance Plan;
Factor 4: Subcontract Management Plan.

Finally, with respect to the cost/price proposal, the solicitation stated that although the cost/price proposal was the least important of the three evaluation factors, the cost could "become more important depending on the equality of offered technical/management proposals." The solicitation provided that the award would be made based on the proposal offering the "best overall value to the government."

The Agency received five proposals in response to the solicitation and determined that three of the proposals were responsive and within the competitive range. These three offerors included Horsley, GeneSys, Inc. ("GeneSys"), and ACRA. The Agency's technical evaluation team ("TET") conducted evaluations of the three offers and found that the Horsley and GeneSys technical proposals were "superior" to the ACRA technical proposal. The TET also found that the Horsley and GeneSys management proposals were "substantially superior" to the ACRA management proposal. As between Horsley and GeneSys, the TET concluded that Horsley's proposal was superior. Based on these evaluations, the Agency initially awarded the contract to Horsley on September 29, 1998.

On November 18, 1998, ACRA filed a bid protest with the United States General Accounting Office ("GAO"), alleging various errors in the Agency's evaluation of its proposal. Rather than defend its action, the Agency ordered a stop work order on the contract and reopened discussions with ACRA, GeneSys, and Horsley. ACRA dismissed its bid protest at GAO.

During this corrective period, the Agency wrote to each offeror regarding their proposal and invited offerors to have oral discussions with the Agency if they wished. The letters to Horsley and GeneSys stated that there were no deficiencies with their technical proposals. The letter to ACRA stated that ACRA had four deficiencies in its technical proposal, primarily relating to ACRA's shelving storage system. ACRA and GeneSys both requested oral discussions; Horsley did not. On February 24, 1999, the Agency issued another amendment to the solicitation, changing the time of performance from 356 days to 270 days. Thereafter, the Agency held the requested discussions with both ACRA and GeneSys. The discussions resulted in ACRA's technical rating improving to all scores of "acceptable." All three offerors submitted final proposal revisions by March 12, 1999. The final proposals from the three offerors all varied in some respects from their initial proposals. In its final proposal, Horsley expressly listed as an enhancement its plan to expedite installation and operation of the new storage and handling system. Specifically, this phased implementation approach would allow, contrary to the terms of the solicitation, progressive occupancy of the system. The approach also would result in the Agency saving money.

The TET evaluated the revised technical and management proposals separately. Each factor in each category was given a rating of either highly acceptable ("HA"), acceptable ("A"), marginally acceptable ("MA"), unacceptable ("UA"), or deficient ("D"). Each factor also was given a risk level of either low ("L"), moderate ("M"), or high ("H"). The proposal then was given an overall rating and risk level. The evaluations were as follows:

| | ACRA | | GENESYS | | HORSLEY | |
|---|---|---|---|---|---|---|
| TECHNICAL | Risk | Rating | Risk | Rating | Risk | Rating |
| Factor 1 | L | A | L | A | L | A |
| Factor 2 | L | A | L | A | L | A |
| Factor 3 | L | A | L | HA | L | HA |
| Factor 4 | L | A | L | A | L | HA |
| Factor 5 | L | HA | L | HA | L | HA |
| | | | | | | |
| MANAGEMENT | | | | | | |
| | | | | | | |
| Factor 1 | L | A | L | HA | L | HA |
| Factor 2 | L | A | L | HA | L | HA |
| Factor 3 | L | A | L | HA | L | HA |
| Factor 4 | L | A | L | A | L | A |
| | | | | | | |
| OVERALL | L | A | L | HA | L | HA |

As indicated on the above chart, ACRA received an overall rating of "Acceptable" and "Low Risk." ACRA received only one rating of "Highly Acceptable" out of nine. ACRA had the lowest cost proposal.

GeneSys received an overall rating of "Highly Acceptable" and "Low Risk." Gene-Sys received five ratings of "Highly Acceptable" out of nine. GeneSys had the next lowest price proposal.

Horsley received an overall rating of "Highly Acceptable" and "Low Risk." It received six ratings of "Highly Acceptable" out of nine. Of particular significance here, two of Horsley's six "Highly Acceptable" ratings (in Technical Factors 4 and Management Factor 1) were due to its unique phased implementation plan for project completion.[4] The TET concluded that this phased implementation plan would result in an estimated savings of $307,500 to the government. Leaving aside the anticipated cost savings, Horsley had the most expensive proposal. Horsley's proposal was 5% more than ACRA's proposal, and 3% more than Gene-Sys's proposal.

Based on the TET evaluation, the contracting officer concluded that the Horsley proposal was "the most advantageous to the Government and represents the best value." Specifically, the contracting officer noted:

> The Horsley Company's technical proposal offered electrical controls that will provide for significant improvements in system design, will allow for ease of troubleshooting (maintenance) and future system expansion by the Government, and will increase system software integration. The Horsley Company's technical proposal also offered phased implementation which would allow continued use of existing storage/conveyor equipment and will allow progressive occu-

pancy by the Government to the completed phases up to 3 months ahead of required contract schedule.

The contracting officer also found that the "advantages identified in The Horsley Company's proposal offset the 5% price difference . . . of ACRA Inc.'s total price and the 3% price difference . . . of GeneSys Inc.'s total price." Accordingly, the Agency lifted the stop work order in effect since December 1998 and began the contract.

On April 23 and 30, 1999, respectively, GeneSys and ACRA filed protests at the GAO. The Agency once again issued a stop work order on the contract. On May 4, 1999, the Agency issued an "Authorization For Contract Performance Notwithstanding A Protest," effectively overriding the GAO's automatic stay of performance pending the resolution of the bid protest.[5]

On May 25, 1999, ACRA filed a bid protest in this court, challenging the Agency's award of the contract to Horsley and requesting a temporary restraining order ("TRO").[6] This court denied the TRO on May 26, 1999. By agreement of the parties, oral argument on the merits of the dispute and ACRA's request for a permanent injunction were heard together on June 24, 1999.

## DISCUSSION

### I. The Scope and Standard of Review

The court's jurisdiction over post-award bid protest actions is provided for under the Tucker Act, 28 U.S.C. § 1491(b)(1) (1994 & Supp.1999). Under that statute, review of a post-award bid protest action is based on the administrative record developed before the relevant contracting agency. *See Cubic Applications, Inc. v. United States*, 37 Fed.Cl. 339, 342 (1997). This court is required to apply the standard of review prescribed in the Administrative Procedure Act, which au-

---

4. The higher ratings given specifically for phased implementation are indicated in correspondence between the TET and the contracting officer on April 8, 1999. In this correspondence, the TET stated that higher ratings were warranted in Technical Factor 4 and Management Factor 1 due to Horsley's phased implementation plan.

5. The Agency's actions were taken pursuant to FAR 33.104.

6. ACRA represented at a telephone status conference on May 26, 1999 that it would take immediate action to notify the GAO of its pending protest in this court, so the matter may be dismissed. *See* 4 C.F.R. § 21.11(a).

thorizes a court to hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1994); *see Southfork Sys., Inc. v. United States,* 141 F.3d 1124, 1132 (Fed. Cir.1998); *Miller–Holzwarth, Inc. v. United States,* 42 Fed.Cl. 643, 649 (1999); *Dubinsky v. United States,* 43 Fed.Cl. 243 (1999).

■ The aggrieved bidder has the burden to demonstrate that there is no rational basis for the agency's decision. *See Delbert Wheeler Const., Inc. v. United States,* 39 Fed.Cl. 239, 247 (1997), *aff'd,* 155 F.3d 566 (1998). The court may not substitute its judgment for that of the agency. *See IMS Servs., Inc. v. United States,* 33 Fed.Cl. 167, 179 (1995). The court only may interfere where it is clear that the agency's determinations were "irrational and unreasonable." *Id.* In this connection, contracting officials have broad discretion in negotiated procurements (like the one at issue here) to determine which technical proposal best meets its needs. *See E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed.Cir.1996); *LaBarge Prods., Inc. v. West,* 46 F.3d 1547, 1555 (Fed. Cir.1995) (citing *Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 65, 617 F.2d 590, 597–98 (1980)). When an evaluation is challenged, the court is to "examine the record to determine whether the agency's judgment was reasonable and consistent with stated evaluation criteria." *Lear Siegler Services, Inc.,* B–28034.2, 98–2 CPD ¶ 136. With these principles in mind, the court now turns to the merits of ACRA's complaint.

## II. Horsley's Phased Implementation Approach Was Properly Evaluated As An Enhancement

ACRA's principal contention before this court is that the Agency erred in giving Horsley credit for its phased implementation approach. ACRA contends that phased implementation does not fit within the solicitation's definition of an "enhancement." ACRA further contends that phased implementation does not achieve the goals of the solicitation. In particular, ACRA argues that as defined in the solicitation, "enhancements" are only those changes to the solicitation that "perform the required function in a way that results in better performance." In ACRA's view, phased implementation deals with scheduling and management and is not a "function" within the meaning of the term "enhancement" under the solicitation. According to ACRA, if the Agency desired phased implementation of the schedule it should have amended the solicitation to allow all offerors the opportunity to revise their proposals to meet this new requirement. ACRA argues that the Agency's failure to re-solicit the proposal resulted in an improper award to Horsley based on undisclosed evaluation criteria. ACRA also argues that because Horsley's proposal did not conform to the stated installation method, Horsley's proposal was not responsive and must be rejected.

■ The court agrees that the government is not permitted to rely upon undisclosed evaluation criteria when evaluating proposals. *See Candle Corp. v. United States,* 40 Fed.Cl. 658, 663 (1998); FAR 15.206(d) ("If a proposal of interest to the Government involves a departure from the stated requirements, the contracting officer shall amend the solicitation."). However, for the reasons that follow, the court does not agree that the Agency relied on undisclosed evaluation criteria in this case.

■ As noted above, the solicitation defined an enhancement as:

> any proposed change which performs the required function in a manner different from the RFP Specification/Scope of Work, but which results in better performance, safer operation, or lower cost at no sacrifice in performance.

In addition, the solicitation also clearly stated that the Agency was looking for "maximum acceleration of performance ... while minimizing disruption/downtime." To achieve this goal, the solicitation contemplated that the awardee would "install as much of the new system as possible prior to removing the existing system" so that down time would be minimized. Rather than installing as much of the new system before the old, Horsley proposed removing the old system in sections and replacing it in a phased manner

that would minimize disruption and allow the Agency to begin using the new sections sooner. The Agency determined that the Horsley approach, which did not wait for all of the old equipment to be removed before the new system was installed, was an enhancement because it would allow the Agency to use the new system up to three months earlier, and it would save the Agency money.[7]

Whether Horsley's phased implementation proposal was properly considered as an "enhancement" is a matter of both contract interpretation and agency discretion.[8] As a matter of contract interpretation, the court rejects ACRA's contention that the definition of "enhancement" in the solicitation does not include scheduling changes that allow for quicker installation and use of the storage system. As noted above, an "enhancement" is a change that improves performance of a "required function." Horsley's approach to installation is consistent with this definition of the term. Here, the solicitation specified requirements for both installation and operation of the storage system. Thus, an "enhancement" under the present solicitation encompasses not only operation of the new system, but also installation of the new system. In such circumstances, the plain words of the definition in the solicitation support the Agency's reading. *See Goldsmith v. United States*, 42 Fed.Cl. 664, 668 (1999) (stating that "[w]hen the contract language is unambiguous, the court's inquiry is at an end

and the plain language of the contract is controlling").[9]

In addition, phased implementation certainly is consistent with the purpose of the enhancement provision, which is to encourage faster, better, and cheaper ways to install and operate the storage system. *See Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed.Cir.1991) (the court must interpret the contract in order to "effectuate its spirit and purpose"). Therefore, the Agency did not err in giving Horsley credit for its phased implementation approach.

▉ Moreover, the court believes that the Agency properly used the phased implementation plan as an enhancement and not an undisclosed evaluation factor. The record supports the Agency's contention that phased implementation was not used as an undisclosed evaluation factor. In particular, Gene-Sys, who did not propose a phased implementation plan, received an overall rating of "highly acceptable," including a single "highly acceptable" rating in one of the categories in which Horsley received enhancement credit for phased implementation. This confirms that the Agency was willing to seriously consider proposals that did not include a phased implementation approach.

Finally, ACRA's contention that Horsley's proposal was not responsive because it deviated from the stated installation plan in the solicitation must fail. An "enhancement" by its very terms contemplates some deviation from stated solicitation requirements.[10]

7. ACRA also argues that Horsley did not follow the solicitation by failing to identify phased implementation as an enhancement in its proposal. This is incorrect. Although phased implementation was not placed on the "Enhancement/Value Added Features/Exceptions List" on the initial proposal submitted by Horsley, phased implementation clearly was listed as a value added "enhancement" when revised final offers were submitted in March 1999.

8. The government asserted at oral argument that Horsley's phased implementation proposal was responsive to the solicitation's installation requirements without resort to the "enhancement" provision. The record indicates, however, that Horsley was given credit for its phased implementation plan as an enhancement. Thus, the court will proceed with defendant's original argument, which was that Horsley was properly given credit for the phased implementation plan as an enhancement.

9. Although the word "function" is not defined in the solicitation, a "function" includes "any of a group of related actions contributing to a larger action." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed.1998).

10. Contrary to ACRA's assertions, the court also believes that phased implementation perfectly matches the Agency's goals of maximizing acceleration and minimizing disruption. Moreover, the court will not second guess the Agency's findings in this regard. The case law is clear that an agency has broad discretion to evaluate proposals and make determinations concerning technical matters, particularly in negotiated procurements. *See E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed.Cir.1996). This broad discretion is justified because a negotiated procurement is "inherently a judgmental process which cannot accommodate itself to absolutes, at least not without severely impacting the quality

Horsley's proposal, which included an appropriate enhancement, was therefore responsive, even though it deviated from the solicitation on the installation plan. In fact, the court does not find on this record that Horsley's modification of the installation plan identified in the solicitation rendered its proposal non-responsive. As a matter of degree, Horsley's modification was slight and remained consistent with the goals and purpose of the solicitation.

Accordingly, ACRA has failed to show how the Agency's decision to treat Horsley's phased implementation proposal as an enhancement was arbitrary, capricious, or otherwise not in accordance with law.[11]

### III. The Agency Engaged In Meaningful Discussions

ACRA also argues that the Horsley award should be set aside because the Agency did not engage in meaningful discussions with ACRA concerning its technical and management proposals under FAR § 15.306(d)(3).

With respect to ACRA's technical proposal, ACRA's contention that the Agency did not engage in meaningful discussions with regard to technical issues is a close question, especially where an enhancement is at issue.

 FAR § 15.306(d)(3) states that:
[t]he contracting officer shall, . . . indicate to, or discuss with, each offeror still being considered for award, significant weaknesses, deficiencies, and other aspects of its proposal . . . that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award. *The scope and extent of discussions are a matter of contracting officer judgment.* (emphasis added).

of judgment called for." *Delbert Wheeler Const., Inc. v. United States,* 39 Fed.Cl. 239, 247 (quoting *Sperry Flight Sys. v. United States,* 212 Ct.Cl. 329, 548 F.2d 915, 921 (1977)).

11. ACRA also argued that the Agency has no guarantee that Horsley will in fact achieve the results they claim. At oral argument, the government, with ACRA's consent, added a copy of Horsley's final contract to the record. The contract confirms Horsley's obligation to meet its early schedule.

Discussions are conducted in order to "advise offerors within the competitive range of informational deficiencies in their proposals so that they can be given an opportunity to satisfy the government's requirements." *CACI Field Servs., Inc. v. United States,* 13 Cl.Ct. 718, 731 (1987) (quoting *Furuno U.S.A., Inc.,* B–221814, 86–1 CPD ¶ 400, at 5). However, the government "need not discuss every aspect of the proposal that receives less than the maximum score or identify relative weaknesses in a proposal that is technically acceptable but presents a less desirable approach than others." *Development Alternatives, Inc.,* B–279920, 98–2 CPD ¶ 54 (discussing FAR § 15.610, predecessor to FAR § 15.306(d)(3)); *see SeaSpace Corp.,* B–252476.2, 93–1 CPD ¶ 462, at 15, *recon. denied,* B–252476.3, 93–2 CPD ¶ 251.

██ Under FAR § 15.306(d)(3), the conduct of discussions ultimately is a matter of agency discretion. Thus, it follows that the agency is not required to reveal every enhancement under this section unless the Agency feels it is necessary to do so, or it wishes to make evaluations based upon new criteria. Here, as indicated above, the Agency put all parties on notice that it would consider enhancements. The court also found, above, that phased implementation was not an undisclosed evaluation factor. In such circumstances, whether the Agency should have discussed phased implementation with ACRA was a matter left to the sound discretion of the Agency.[12] In the court's view, the Agency might have been better served by informing ACRA and GeneSys that it also would consider a phased implementation approach. Under this view, unique aspects of Horsley's phased implementation approach would not have had to be revealed.[13] Rather,

12. The record shows, for example, that the Agency's discussions regarding ACRA's proposal resulted in ACRA receiving acceptable technical ratings when it initially had received only marginally acceptable ratings.

13. Defendant argues that it would have been inappropriate for the Agency to disclose Horsley's phased implementation plan to other offerors under FAR § 15.306(e)(2). FAR § 15.306(e)(2) states that:
[g]overnment personnel involved in the acquisition shall not engage in conduct that [r]eveals

the Agency could have provided a generic description of the phased approach during discussions to ensure fairness to all.

Notwithstanding the above, however, the court is not prepared to find on this record that the Agency's failure to mention phased implementation in discussions amounted to a clear abuse of discretion.[14] *See IMS Servs., Inc. v. United States,* 33 Fed.Cl. 167, 179 (1995) (the court may not substitute its judgment for that of the agency). This is not to say that there might not be a situation in which an enhancement so deviates from the solicitation requirements and becomes a bona fide evaluation factor that must be disclosed. It simply is not the case here.

ACRA emphasized at oral argument that the Agency also failed to engage in meaningful discussions with respect to its management proposal. Apparently ACRA believes that the Agency was obligated to provide ACRA with additional guidance on how to increase its score from "acceptable" to "highly acceptable." Similar to the above argument, however, ACRA's argument is flawed.

 As stated above, the agency need not identify weaknesses in a proposal that is rated "acceptable" but presents a less desirable approach than others. *See Development Alternatives, Inc.,* B–279920, 98–2 CPD ¶ 54. ACRA's reliance on cases such as *Eldyne, Inc.,* B–250158.2, 1993 WL 212631; *Jaycor,* B–240029.2, 90–2 CPD ¶ 354; and *Global Industries, Inc.,* B–270592.2, 96–2 CPD ¶ 85, to illustrate that the agency must go above and beyond simply identifying deficiencies is misplaced.[15] Each of those cases involved situa-

tions in which the record was clear that the agency had concerns about the level of acceptability of the protester's proposal and neglected to raise those concerns during discussions. Such a situation is not present here.

In this case, ACRA's management proposal was rated as "acceptable." There is no evidence in the administrative record to suggest that the evaluators gave ACRA a score of "acceptable" but held serious concerns about ACRA's management proposal. Although ACRA was not as highly rated as the other offerors, ACRA has not shown based on the record that the Agency's actions in conducting discussions with ACRA were arbitrary, capricious, or involved an abuse of discretion.

## IV. ACRA Was Not Prejudiced By Agency Action

For the above-stated reasons, the court finds that the Agency did not err in evaluating Horsley's phased implementation approach as an enhancement or in conducting meaningful discussions with ACRA. However, the court also finds that even if the Agency had erred, ACRA was not prejudiced by the alleged error.

 In order to prevail in a bid protest, a protester must demonstrate not only that there was a significant error in the procurement process, but also that the error prejudiced the protester. *See Data General Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed. Cir.1996). To establish prejudice, "a protester must show 'that there was a substantial

an offeror's technical solution, including unique technology, innovative and unique uses of commercial items, or any information that would compromise an offeror's intellectual property to another offeror.
While for the reasons stated above, the court finds that the Agency did not abuse its discretion in failing to tell other offerors about Horsley's phased implementation plan, the court does not believe that the Agency would have violated FAR §· 15.306(e)(2) if it had simply informed the other two offerors that it would consider a phased implementation approach.

14. ACRA suggested at oral argument that an enhancement which is not prohibited from being disclosed under FAR § 15.306(e)(2) *must* be revealed to offerors in order to make discussions

meaningful. The court fails to adopt such a narrow interpretation. Such a bright line rule would require disclosure of all "enhancements" that do not qualify for protection as technical or proprietary information under FAR § 15.306(e)(2). This view is not consistent with the broad discretion afforded to contracting officers under FAR § 15.306(d)(3) to decide which information should be shared during discussions. In addition, it undercuts the major policy goal of encouraging innovation of new ideas from offerors. *See* JOHN CIBINIC, JR. AND RALPH C. NASH, JR. *FORMATION OF GOVERNMENT CONTRACTS* 903 (3d ed.1998).

15. These cases also discuss § FAR 15.610, predecessor to FAR § 15.306(d)(3).

chance it would have received the contract award but for that error.'" *See Alfa Laval v. United States,* 175 F.3d 1365, 1367 (Fed. Cir.1999) (quoting *Statistica, Inc. v. Christopher,* 102 F.3d 1577 (Fed.Cir.1996)); *see also Analytical & Research Technology, Inc. v. United States,* 39 Fed.Cl. 34 (1997). When the procurement defect is a failure to evaluate proposals properly, the protester must show that a proper evaluation would have given it a chance to win the award. *See* JOHN CIBINIC, JR. AND RALPH C. NASH, JR. *FORMATION OF GOVERNMENT CONTRACTS* 1528 (3d ed.1998); *see e.g., Labat–Anderson, Inc.,* B–246071.2, 92–1 CPD ¶ 193 (where it was unclear how protester's proposal would have been evaluated absent the procurement error, protester sufficiently proved that but for the improper evaluation, it would have had a chance to win the award).

■ Here, ACRA cannot prove that it was prejudiced by the ratings given to Horsley for its phased implementation plan, because even if Horsley had not been given credit for phased implementation in Technical Factor 4 and Management Factor 1, Horsley still received four "Highly Acceptable" ratings as compared to ACRA's single "Highly Acceptable" rating.[16] Without regard to phased implementation, Horsley received "Highly Acceptable" ratings in areas of electrical controls, management approach, organizational structure, and quality proposal. The contracting officer found that the electrical controls "will provide for significant improvements in system design, will allow for ease of troubleshooting (maintenance) and future system expansion by the Government, and will increase system software integration." Horsley's management proposal also "offered an effective program management approach, organization structure consisting of a highly experienced project team and quality control system." In such circumstances, Horsley's proposal still was superior to ACRA's proposal.

At oral argument ACRA suggested that if Horsley was not given credit for the en-

hancement, and had the Agency conducted meaningful discussions with ACRA to raise its management scores from "acceptable" to "highly acceptable," ACRA would have had a "substantial chance" to receive the award because Horsley's proposal would not have been that much more superior and ACRA's proposal was the least costly. The fact that Horsley's proposal is more costly than ACRA's was not determinative because cost was the least significant factor in the evaluation. As the solicitation stated, "technical and management areas are significantly more important than cost/price." Further, ACRA's argument is too speculative to establish that it would have had a substantial chance to win the award. The assumption that meaningful discussions with ACRA over its management proposal would have resulted in a "highly acceptable" rating has no factual basis.

Finally, the court notes that the GeneSys proposal also was considered to be superior to ACRA's proposal, thus making ACRA's contention that it had a substantial chance to get the award even more remote. *See Lear Siegler Services, Inc.,* B–28034.2, 98–2 CPD ¶ 136 (protester not prejudiced by failure of agency to perform a proper price/technical tradeoff because protester was not next in line for award); *see also Agriculture Tech. Partners,* B–272978, 96–2 CPD ¶ 226; *Precision Echo, Inc.,* B–276740.2, 97–2 CPD ¶ 114.

In view of the foregoing, the court finds that ACRA was not prejudiced by any error committed by the Agency in giving Horsley "enhancement" credit for its phased implementation approach because it did not have a substantial chance of winning the award. *See Data General,* 78 F.3d at 1562–63.

### CONCLUSION

For all of the above-noted reasons, the court concludes that the Agency's procurement decision was not arbitrary, capricious, or otherwise not in accordance with law. Accordingly, judgment for plaintiff on the administrative record and request for a per-

---

**16.** The converse of this argument is true, as well. If discussions had been conducted and ACRA had proposed a phased implementation plan that improved its score in two categories to "Highly

Acceptable," ACRA would have had a total of three "highly acceptable" ratings compared to Horsley's six "Highly Acceptable" ratings.

manent injunction is **DENIED** and judgment for defendant is **GRANTED**. The clerk is directed to enter judgment accordingly. Each party shall bear their own costs.