MILLER–HOLZWARTH, INC., Plaintiff,

v.

The UNITED STATES, Defendant,

and

Optex Systems, Inc., Intervenor.

No. 98–576C.

United States Court of Federal Claims.

Jan. 6, 1999 [1].

1. This opinion was issued under seal on December 18, 1998. Pursuant to ¶ 2 of the ordering language, the parties identified protected/privileged material subject to deletion. Brackets identify the material deleted.

David R. Hazelton, Washington, DC, for plaintiff. Minh N. Vu, Latham & Watkins, of counsel.

Marshall J. Doke, Jr., Dallas, TX, for intervenor. William G. Whitehill, Gardere & Wynne, of counsel.

William G. Kanellis, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant.

## OPINION

MILLER, Judge.

This matter is before the court after argument on cross-motions for summary judgment. Miller–Holzwarth, Inc. ("plaintiff"), challenges the decision of the Department of the Army (the "Army") awarding a contract for the manufacture and production of optically improved periscopes to Optex Systems, Inc. ("intervenor"). The issues under consideration are (1) whether the Army violated the Administrative Procedure Act, 5 U.S.C. § 706(1)(A) (1994) (the "APA"), and its own procurement guidelines by arbitrarily awarding a contract to intervenor; (2) whether the Army violated federal laws and regulations by offering improper advantages to intervenor in the course of negotiations on intervenor's offering price, thereby prejudicing the position of plaintiff prior to award; and (3) whether the Army violated the APA and procurement guidelines by arbitrarily granting intervenor a waiver of First Article Testing ("FAT").

## FACTS

Plaintiff and defendant filed a stipulation of facts in which intervenor did not participate. The following are the core facts that are not disputed. On December 1, 1997, the Army issued Solicitation No. DAAE20–97–R–0232 for the manufacture of periscope models 15, 20, M–17, M–26, M–27, and M–45 (collectively, the "Bradley periscopes") for the Army's Bradley fighting vehicle.[2] The solicitation was for a three-year requirements contract with an option evaluated annually to extend up to two additional years at the discretion of the contracting officer.

Section M of the solicitation, which addresses evaluation and award criteria, identified price and past performance as the two critical components that would substantiate the basis for award. With respect to price, the offers were evaluated based on each proposal's "total evaluation price," which consisted of basic Contract Line Item Numbers ("CLINs"), option CLINs, and FAT report CLINs. Past performance was evaluated, as follows:

> (1) Past performance information is relevant information regarding a contractor's actions under previously awarded contracts. It includes the contractor's record of conforming to specifications and to standards of good workmanship; the adherence to contract schedules, including the administrative aspects at *performance;* the contractor's history for reasonable and cooperative behavior and commitment to customer satisfaction; and generally, the contractor's business-like concern for the interests of the customers.

Ratings for past performance were assessed on a scale of risk ratings: "Excellent/Very Low Risk," "Good/Low Risk," "Adequate/Moderate Risk," "Marginal/High Risk," "Poor/Very High Risk," or "Neutral/Unknown Risk." Section M indicated that the award would be made to the offeror whose proposal offered the greatest value based on past performance and price, with past performance to be the more significant of the two factors. Section L of the solicitation stated that past performance would be assessed by considering "work covered during the last three years performance on prior production programs which are similar to the effort required on this solicitation.... [T]he

---

**2.** In addition to the four periscopes designed for use with the Bradley Fighting Vehicle, the solicitation also requested proposals for the manufacture of periscopes for use on the Army's Fire Support Team Vehicle and the Field Artillery Ammunition Supply Vehicle.

word 'similar' means a contract exceeding $1,000,000 for the manufacture of optical instruments or periscopes."[3] Section L also indicated that offerors with experience manufacturing periscopes, as opposed to other optical instruments, e.g., back-up sights, were to be credited with a heightened past-performance rating.

The procedure for gathering information regarding plaintiff's and intervenor's past performance involved the compilation and analysis of Performance Risk Evaluation Questionnaires (the "PREQs") and Informal Contractor Review forms. The PREQs were mailed to independent Army evaluators who had experience with prior contracts identified by each offeror as relevant to their past performance. The PREQs identified five specific criteria—quality, scheduling, overall management, technical skills, and financial/cost management—that evaluators could rate as Excellent, Good, Average, Fair, or Poor. In addition, the PREQs permitted evaluators to comment on any delays in past performance, the cause of such delays, and an offeror's overall strengths and weaknesses. The Informal Contractor Review form was similarly distributed, and sought the same type of information as did the PREQs, yet from broader perspective.[4]

For the purpose of assessing past performance, intervenor designated three contracts, two for the delivery of optically improved back-up sights, and one, ongoing as of December 1, 1997, for the delivery of optically improved Abrams-type periscopes (the "Abrams contract"). The Army considered these back-up sights and the Abrams periscope to be "similar," as defined by the terms of the solicitation, to the Bradley periscopes. Intervenor received the highest rating, "Excellent," for all three contracts on quality of performance and scheduling and unanimous rating of "Strongly recommend" with respect to the award of future contracts. The evaluation indicated that intervenor's performance on the Abrams contract had suffered a production delay, but that the Army, not intervenor, had caused it. Although intervenor had yet to produce a production unit periscope on the Abrams contract as of December 1, 1997, it had secured FAT approval.

In contrast to the production history of intervenor, which did not include the manufacture of the Bradley periscope in any capacity, plaintiff was considered by the Army to be its "current periscope producer." Regarding the eight contracts that plaintiff proffered for the purpose of assessing past performance, plaintiff received a unanimous rating of "Excellent" for quality, and a unanimous rating of "Good" with respect to scheduling. Army Performance Evaluator [ ] commented that "[plaintiff] has excellent quality record, but has experienced some scheduling problems in the past. [Plaintiff] is delinquent on a regular basis, but completes contract within short time frame. [Plaintiff] needs to improve their delivery record and delivery promises." Plaintiff's initial evaluation also indicated that five of the independent evaluators would "strongly recommend" and that three would "recommend" (the second highest rating) that plaintiff be awarded future contracts.

3. Contract Specialist Richard Brandenburg testified at deposition that the purpose of the $1 million threshold was to consider only those contracts under which an offeror had demonstrated a capability to deliver large quantities of a particular product on a production basis.

Furthermore, defendant and intervenor assert that ascertaining the scope of work covered during the last three years is a question of law, and contest plaintiff's interpretation that this language refers to the three years prior to the date of the solicitation's issuance, December 1, 1997. Contracting Officer John E. Holmgren answered yes during his deposition to the question "And 'the last three years' refers to three years prior to the date of the solicitation; isn't that true?" *See* Deposition of John E. Holmgren, Sept. 16, 1998,

at 51. In interpreting the contract, the court determined that the Army's reading is correct. As a matter of policy, plaintiff's reading would prohibit the contracting officer from considering reports on an offeror's performance during the period before issuance of the solicitation and award, which would preclude the most current information and thus make no sense.

4. This form presented a rather generic, non-specific depiction of each offeror's performance history, soliciting information regarding an offeror's financial capability, integrity, and business ethics, as well as scheduling history, past performance record, relevant skills, operational capability, and experience.

After analyzing the various forms and questionnaires returned by the independent evaluators, [ ] determined that intervenor registered a past-performance rating of "Excellent/Very Low Risk," and plaintiff, a "Good/[Low Risk]" rating. Although [ ] commented that "[e]valuation comments were excellent and good overall" regarding plaintiff's past performance, the Army's initial evaluation for plaintiff concludes "that [plaintiff] can deliver a quality product, but based on problems with scheduling workload, deliveries may not consistently occur in a timely manner."

On April 22, 1998, approximately one week after [ ] completed plaintiff's and intervenor's initial evaluations, Contracting Officer John E. Holmgren initiated discussions with plaintiff's President Frank Campolo and Dan Balch, intervenor's President. In separate letters to both offerors, for the purpose of "opening . . . discussions for this procurement," Mr. Holmgren identified areas in each offeror's proposal that the Army considered to be weak or in want of revision. In his April 22, 1998 letter to Mr. Campolo, Mr. Holmgren stated that plaintiff's offer was "significantly weak in the scheduling performance portion of the Government's past performance evaluation" and further explained that "[o]ur evaluation indicates that the delinquencies existed on some of the contracts completed during the evaluation period. The delinquencies were attributed to scheduling problems."

Mr. Holmgren's April 22, 1998 letter to Mr. Balch indicated that the Army found no weaknesses in intervenor's offer with respect to past performance, but that plaintiff's bid price was too high. This letter further stated that the Government would be willing to negotiate price if intervenor so desired.[5] Mr. Holmgren enclosed an attachment enumerating prices on three prior contracts between the Army and plaintiff for each periscope type at issue under the subject solicitation.

Plaintiff acknowledged in writing receipt of Mr. Holmgren's letter on April 27, 1998; on the following day, Mr. Campolo met with Mr. Holmgren and other Army procurement officials to discuss the Army's concerns with plaintiff's proposal. Plaintiff provided the Army an extensive follow-up summary of these discussions, outlining plaintiff's continuing efforts to secure greater control over scheduling and deliveries, as well as to improve overall operations. Based on the content of these discussions and the corrective action described in plaintiff's summary, the Army raised plaintiff's past-performance rating from "Good/Low Risk" to "Excellent/Very Low Risk."[6]

Responding to the Army's concern regarding its high contract price, intervenor submitted a reduced price to the Army on April 30, 1998. Intervenor reduced its original offering price of $9,161,906.02 by 6.7%, or $613,847.00, subject to contingencies related to the award of certain options in the instant solicitation, as well as options in an unrelated solicitation.[7] On May 1, 1998, Mr. Brandenburg advised Mr. Balch by telephone that the revised offer was unacceptable because it was tied to an option on a separate contract and required a guarantee that the option on the instant solicitation would be exercised in intervenor's favor.

---

5. Intervenor's initial bid price of $9,161,906.02 was $[ ] higher than plaintiff's.

6. In support if its decision to increase plaintiff's past-performance rating from "Good" to "Excellent," the Army memorialized the following for the procurement record:

> In an ongoing effort to eliminate the delinquency problems, [plaintiff] has instigated a number of efforts to provide greater control of schedules and deliveries. They had developed and have in place expanded documentation of work instructions to enhance the shop floor assembly operations. They have invested in new equipment that will yield periscope products of improved quality and workmanship. They have obtained the necessary equipment to perform more operations in house that previously were bought. . . . This gives them better control of important component material. . . . [Plaintiff] has developed a comprehensive computer aided scheduling and materials planning program. . . . The backlog at [plaintiff] is presently very low. Manufacturing capacity is not a problem now, and the workforce will be increased as needed.

7. The proposed reduction in price was not based entirely on the potential award of these option contracts. Intervenor also indicated in its counteroffer that negotiations with its suppliers were responsible, in part, for the reduction.

The Army closed discussions by letter to plaintiff and intervenor dated May 4, 1998, requesting the submission of Best and Final Offers ("BAFOs") by May 8, 1998. Plaintiff and intervenor timely submitted their BAFOs, superseding all original and revised interim offers. Although plaintiff did not submit a revised evaluated cost, plaintiff's BAFO in the amount of $[ ] reflected a[ ]% reduction from its original evaluated cost. Intervenor removed all contingencies from its revised proposal, and reduced its evaluated cost for a second time by $543,452.89 to $8,004,606.13, or 12.6% less than that indicated in its initial offer. Both plaintiff and intervenor requested a waiver for FAT, which the Army subsequently granted on November 6, 1997.

Because intervenor's evaluated cost at BAFO was $8,004,606.13, or [ ]%—only $[ ]—less than that of plaintiff, and because both parties received an identical past-performance rating, the Army concluded in its Memorandum of Decision that "the proposal of [intervenor] represent[s] the best value to the Government." Intervenor's final bid price was $190,679.39, or 2.4% higher than that of the lowest submitted BAFO.[8] On May 20, 1998, the Army awarded the contract to intervenor. The Army notified plaintiff by letter dated May 22, 1998, that it had not been awarded the contract, explaining that "your total evaluated price of $ [ ] on a without First Article Basis was higher than [intervenor's] total evaluated price of $8,004,606.13. Therefore, your company lost this contract award merely because of your company's higher price."

On June 2, 1998, plaintiff filed a bid protest with the office of General Counsel of the U.S. General Accounting Office. In an administrative report dated July 6, 1998, prepared for Acting U.S. Comptroller General, James F. Hinchman, Army legal counsel assessed five challenges[9] raised by plaintiff regarding the Army's conduct through the course of the procurement, ultimately concluding that "[plaintiff's] protest is without merit, and should be dismissed or denied, as appropriate." This report was forwarded to counsel for plaintiff and intervenor; plaintiff then filed a complaint for declaratory and injunctive relief in the Court of Federal Claims on July 14, 1998; Optex System's, Inc., as the awardee, intervened as a third-party defendant.

In light of the competition-sensitive information involved in this case, the court on July 16, 1998, entered a protective order. By order entered on July 22, 1998, the court denied plaintiff's application for a temporary restraining order. The matter was not amenable to review on any so-called administrative record, because the Army had augmented the pre–award documents with after-the-fact statements and affidavits by Army personnel, *see, e.g., GraphicData, LLC v. United States,* 37 Fed.Cl. 771, 778–80 (1997), which are discoverable in the normal course. The July 22 order limited discovery to plaintiff's allegations of unfair and unequal treatment afforded intervenor concerning: 1) the contrast between the original concerns raised and its "Excellent" past-performance rating, 2) negotiations, and 3) the timing of the waiver of the FAT requirement. On November 23, 1998, plaintiff filed its motion for summary judgment; defendant and intervenor filed cross-motions for summary judgment.

8. The Army also evaluated a third proposal from [ ]. Although [ ] submitted the lowest evaluated cost at BAFO, the Army rated its past-performance as "Adequate." This comparatively low rating was caused by the Army's considerable doubt regarding [ ]'s competency and ability to respond to the demands of the contract. In light of this past-performance rating, [ ]'s proposal could not remain competitive with that of plaintiff or intervenor, despite [ ]'s very reasonable evaluated cost.

9. Specifically, plaintiff charged (1) that the Army "improperly awarded [intervenor] and [plaintiff] identical ratings ... for past performance even though [intervenor] had never manufactured a Bradley periscope, while ... [plaintiff] has manufactured numerous Bradley periscopes;" (2) that the Army failed to consider specific areas in its past performance evaluation, which, if considered, would allegedly have heightened plaintiff's past performance rating; (3) that contrary to the terms of the solicitation, the Army failed to consider FAT in its evaluation of price, which, if considered, would have entitled plaintiff to award; (4) that the Army improperly waived FAT for intervenor; and (5) that the Army conducted improper and unequal negotiations regarding price with intervenor to the detriment of plaintiff.

## DISCUSSION

### I. *Standard of review*

In 1996 Congress expanded the jurisdiction of the Court of Federal Claims to include post-award bid protests. *See Alfa Laval Separation, Inc. v. United States,* 40 Fed.Cl. 215, 220–21 (1998), *appeal argued,* No. 98–5087 (Fed.Cir. Dec. 9, 1998); *GraphicData,* 37 Fed.Cl. at 778–80 (discussing court's jurisdiction in area of bid protests and impact of 1996 amendments to Tucker Act). Pursuant to 28 U.S.C.A. § 1491(b)(1) (West 1994 & Supp.1998), the court has "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for ... the award of a contract or any alleged violation of statute or regulation in connection with a procurement...." 28 U.S.C.A. § 1491(b)(1). The scope of review prescribed by section 1491(b)(1) is set forth in the APA, and empowers the court to set aside the findings, conclusions, or actions of an agency found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(1)(A) (1994); *see Informatics Corp. v. United States,* 40 Fed. Cl. 508, 513 (1998).

■■■ In its verified complaint plaintiff seeks to enjoin the Army from continuing performance on the contract with intervenor as the contractor. To obtain injunctive relief, a frustrated bidder is required to demonstrate by a preponderance of the evidence that an agency's behavior was 1) without a reasonable basis, or 2) violated pertinent procurement statutes or regulations. *See Alfa Laval,* 40 Fed.Cl. at 220 (citing *Parcel 49C Ltd. Partnership v. United States,* 31 F.3d 1147, 1153 (Fed.Cir.1994), and *CACI Field Servs., Inc. v. United States,* 854 F.2d 464, 466 (Fed.Cir.1988) (*per curiam*)). Entitlement to injunctive relief also requires a disappointed offeror to demonstrate (1) that it will suffer specific irreparable injury if the procurement is not enjoined; (2) that the harm to be suffered by it outweighs the harm to the Government and third parties if the procurement is enjoined; and (3) that granting of the relief serves the public interest. *See Logicon, Inc. v. United States,* 22 Cl.Ct. 776, 795 (1991) (citing *Washington Metro. Area Transit Comm'n v. Holiday Tours,* 559 F.2d 841, 842–43 (D.C.Cir.1977)).

Although a protester need not allege that a procurement decision was motivated by bad faith, procurement officials, particularly in a negotiated procurement, are afforded a high level of discretion. *See Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 65, 617 F.2d 590, 597–98 (1980); *see also Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988) (explaining that bad faith is relevant factor, but need not be proved to establish arbitrary and capricious action by Government). As the Federal Circuit explained in *Parcel 49C,* the courts should play a limited role in the procurement process, and "leav[e] the choice of the contractor up to the Government." 31 F.3d at 1153.

Because each of the parties have moved for summary judgment under RCFC 56, disposition of this case is appropriate only if there are no genuine disputes as to any material fact and the movant is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Golden Pac. Bancorp v. United States,* 15 F.3d 1066, 1071 (Fed.Cir.1994); *Armco, Inc. v. Cyclops Corp.,* 791 F.2d 147, 149 (Fed.Cir.1986). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Each party's motion must be evaluated on its own merits, and all reasonable inferences are to be drawn in favor of the opponent. *See Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir. 1987). As is typical of most post-award bid protest actions, this matter calls for evaluation of, and judgment on, the administrative record; in this context, summary judgment "is an appropriate vehicle to scrutinize an agency's procurement actions because the issues are matters of contractual and regulatory interpretation." *Analytical & Research Technology, Inc. v. United States,* 39 Fed.Cl. 34, 43 (1997).

## II. *Plaintiff's challenges*

### 1. *Evaluation of past performance*

■ After analyzing the various forms and questionnaires completed by the independent Army evaluators, the Army assessed intervenor at the highest possible rating of "Excellent" for past performance. Plaintiff insists that the terms of the solicitation rendered intervenor ineligible for a superior past-performance rating. Defendant and intervenor counter that the past-performance evaluations were conducted fairly and in accordance with the terms of the solicitation.[10]

Plaintiff's argument rests on three grounds. First, because intervenor had yet to produce a single production unit periscope in the three-year period that, according to plaintiff, controlled assessment of past performance, the Army could not meaningfully evaluate intervenor's production and manufacturing capability; therefore, the Army should not have considered intervenor's past performance on the Abrams contract in its analysis. Second, the Army's evaluation ignored the significance of delays encountered by intervenor during performance of the Abrams contract; if considered, these delays would have precluded assessment of intervenor at the highest rating. Third, the Army's evaluation dismissed or ignored specific concerns related in an Informal Contractor Review questionnaire regarding intervenor's performance on the Abrams contract.

The administrative record and related testimony of cognizant procurement officials support a finding that the Army acted well within its discretion 1) to include in its evaluation intervenor's past performance on the Abrams contract and 2) to conclude that intervenor's past performance on the Abrams contract supported the "excellent" rating. Plaintiff correctly points out that intervenor, under the first revised schedule, "failed to deliver the number of units required in December 1997 for every type of Abrams periscope under the contract." Plf's Br. filed Dec. 1, 1998, at 13. However, plaintiff fails to place this fact in proper context.

Although the Army would have had difficulty in assessing intervenor's performance on the Abrams contract if restricted to examination prior to December 1, 1997, the same documents upon which plaintiff relies also indicate that intervenor's deliveries were ahead of schedule for the first quarter of 1998. No provision in the solicitation precluded the Army from considering intervenor's performance after the date that the solicitation was issued. Contrary to plaintiff's position, it would be unreasonable under the terms of the solicitation, and no less unfair to each offeror, if the Army were to disregard meaningful and pertinent information that could only render a more informed and considered award decision.[11]

---

**10.** Intervenor also avers that, in light of the Army's decision to raise plaintiff's past-performance rating from "Good" to "Excellent" on the basis of promises of future performance, the Army's conduct actually favored plaintiff, not intervenor.

**11.** Even were the court to accept plaintiff's argument that intervenor's performance on the Abrams contract should not have influenced the Army's past-performance evaluation, ample evidence is present, notwithstanding the Abrams contract, of intervenor's ability to respond successfully to the Army's scheduling demands. The Army's initial evaluation of intervenor's past performance involved analysis of three PREQs: Two referred to contracts for optically improved backup sights, and the remaining PREQ, to the Abrams contract. The PREQs for both back-up sight contracts indicated that intervenor received a rating of "Excellent" in the "Scheduling" category and that intervenor had experienced no

delays in delivery. Comments specifically directed toward intervenor's timeliness and adherence to schedules stated that "Optex delivered on schedule with no apparent problems" and that "Optex delivered 5 months ahead of schedule." Although plaintiff notes that back-up sights are different than periscopes, plaintiff does not dispute that back-up sights are "similar," as contemplated by the terms of the solicitation, to the Bradley periscopes.

The unstated foundation of plaintiff's argument is that an offeror with experience producing the Bradley periscope unequivocally is entitled to a higher past-performance rating than an offeror with experience producing similar optical instruments or periscopes. This position is both contrary to the express terms of the solicitation and overlooks the provisions of the solicitation permitting assessment of past performance based on items "similar" to the Bradley periscope. In its final analysis, the Army seriously considered pro-

The merit of plaintiff's assertion that the delays during performance of the Abrams contract should have precluded assessment of intervenor at the highest past-performance rating is similarly suspect when considered in context. Plaintiff's preoccupation with the delays experienced by intervenor in December 1997 fails to acknowledge the cause of the delays or intervenor's performance in subsequent months. The Informal Report prepared by Army Industrial Specialist [ ], upon which plaintiff relies, indicates that intervenor was comfortably ahead of schedule in January, February, March, and April 1998. The initial evaluation of intervenor's performance on the Abrams contract plainly states that "[t]here were Government caused delays due to the need to incorporate the [Engineering Change Proposal]s into the contract due to numerous [Technical Data Package] problems." Nothing on the evaluation form indicates that intervenor caused the scheduling delays. Mr. Brandenburg testified during deposition that "the delays were at least 95 percent government caused" regarding intervenor's performance on the Abrams contract. *Deposition of Richard Brandenburg*, Sept. 17, 1998, at 39. From the foregoing references, it is evident that the procurement officials were aware that delays occurred during intervenor's performance of the Abrams contract, yet recognized that, because the delays were attributable to the Army, upon intervenor's ability to perform the Bradley contract under an aggressive delivery schedule was not doubtful.

Plaintiff's remaining contention stems from the allegation that the Army dismissed concerns expressed by [ ] about intervenor's

ability to meet the delivery schedule for the Bradley contract. In his Informal Contractor Review questionnaire, included as part of intervenor's past-performance evaluation, [ ] stated that "[t]his is a first time producer of these type periscopes, as such the offeror will have to start from the beginning with new tooling, which places the schedule at risk." Plaintiff asserts that intervenor could not have received a past-performance rating of "Excellent" unless "the Army gave no apparent weight to [ ]'s concern in the evaluation of Optex's past performance." Plf's Br. filed Nov. 2, 1998, at 15.

When evaluated in its entirety, [ ]'s review is favorable regarding intervenor's performance on the Abrams contract, notwithstanding the lone criticism that is the focus of plaintiff's concern. Plaintiff neither considers nor contests the following findings, also part of [ ]'s review:

Contractor has the necessary organization, experience, operational controls, and technical skills to perform the required work.

The Contractor is presently producing three of the most difficult types of periscopes.

Contractor is capable of complying with necessary quality requirements; quality is not a problem.

Contractor is capable of meeting required delivery schedule.

Contractor has a satisfactory performance record.[12]

When balanced against the substantial endorsements of the other evaluators and the

---

posals from two offerors: first, from the incumbent periscope manufacturer, which suffered from a confirmed history of scheduling and delivery problems, and second, from a manufacturer of similar optical instruments, which maintained a relatively untarnished record of scheduling and on-time delivery. The express terms of the solicitation do not contemplate that the former would be accorded a higher past-performance rating merely because it had direct experience manufacturing the instrument at issue. The past-performance rating was based on numerous factors; direct manufacturing experience was only one of many factors considered.

12. Although the review indicated that intervenor has a satisfactory performance record, [ ] re-

marked that "current[ly] the offeror has 7 open (active) contracts of which one is delinquent, contract caused." Plaintiff also takes issue with this remark, claiming that "[n]o one involved with Optex's past performance evaluation sought to determine whether the 'delinquent' contract referenced was one of the three relevant contracts that formed the basis of Optex's past performance evaluation." Plf's Br. filed Nov. 2, 1998, at 15 n. 5. The court is confident that if the "delinquent contract" was, in fact, one of the three that formed the basis of intervenor's past-performance evaluation, notice of delay caused by the contractor would have been indicated on the PREQs or related evaluation forms. The administrative record is devoid of any such indication.

appreciable weight and number of the foregoing comments, the concerns identified by plaintiff in [ ]'s review pale considerably. Moreover, the deposition testimony of Mr. Holmgren and [ ] reveal that [ ]'s concerns were not dismissed or disregarded, but evaluated in the reasonable context in which they were offered. Mr. Holmgren stated, "I read it and took it for what it said. He [ ] was just stating that it was a possibility when you do new tooling, that there's a possibility there could be a delay in the scheduling." Deposition of John E. Holmgren, Sept. 16, 1998, at 39. Similarly, [ ], responsible for review and compilation of the evaluations, testified:

> I was looking at overall work performance. At the time I did anything, there was a compilation of the material and then I did the analysis on it, looking at what was in Section L, Section M, and did my summary, and actually the rating was assigned at the very end of it to determine, and I didn't consider it to be significant based on overall workload.

Deposition of [ ], Sept. 24, 1998, at 39. These comments militate against plaintiff's assertion that the concerns expressed in [ ]'s review were dismissed; rather, the comments reflect consideration and assessment based on their impact on intervenor's overall past-performance evaluation.[13] The mere fact that these concerns were not afforded a weight more favorable to plaintiff's position does not imply that these concerns were disregarded entirely.

In sum, plaintiff's self-serving reading of the administrative record and strained interpretation of pertinent deposition testimony do not elevate its contentions beyond the argumentative. Intervenor received consistently superior ratings on each of its past-performance evaluation forms. Those negative comments that were received by the Army's procurement officials regarding intervenor's past performance were considered, evaluated, and integrated into the analysis leading to the final rating indicated on the initial evaluation prepared by [ ]. Plaintiff has not identified any portion of the record that constitutes an abuse of discretion on the part of any procurement official, a departure from the terms of the solicitation, or a violation of law. *See E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed.Cir.1996) (reasoning that procurement officials have substantial discretion to determine which proposal represents best value for Government, and that court should defer to agency's best value decision). Because plaintiff has failed to make the required showings, no justification is present to re-evaluate or set aside the existing past-performance ratings.

### 2. *Price*

#### 1) *Alleged unfairness during negotiations*

■ Plaintiff indicts the Army for treating plaintiff unfairly by conducting multiple rounds of price discussions with, and receiving multiple revised price proposals from, intervenor. Plaintiff contends that the Army's conduct violated the "fundamental principle of federal procurement that all offerors must be treated equally," and the more specific principle that "all offerors are entitled to an equal opportunity to revise their proposals." *SmithKline Beecham Pharms., N.A.,* 93–2 CPD ¶ 79, at 4; *see Paramax Sys. Corp.; CAE–Link Corp.,* 93–2 CPD ¶ 282, at 6 (setting aside award because agency conducted another round of price discussions with one offeror after receiving BAFOs and not doing same with protestor).

The following sections of the Federal Acquisition Regulation (the "FAR"), 48 C.F.R., are germane to this discussion:

> § 15.306(d)(2) The primary objective of discussion is to maximize the Government's ability to obtain best value, based on the requirement and the evaluation factors set forth in the solicitation.

> § 15.306(d)(3) The contracting officer shall ... indicate to, or discuss with, each offeror still being considered for award, significant weaknesses, deficiencies, and other aspects of its proposal (such as cost, price,

---

**13.** Intervenor correctly states that "[ ]'s comment regarding production capacity is not about past performance. It is a speculation about future production capabilities rather than a statement of the contractor's action under previously awarded contracts." Intvr's Br. filed Nov. 18, 1998, at 25.

technical approach, past performance, and terms and conditions) that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award. The scope and extent of discussions are a matter of contracting officer judgment.

§ 15.306(e) Limits on exchanges. Government personnel involved in the acquisition shall not engage in conduct that—

(1) Favors one offeror over another;

. . . .

(3) Reveals an offerors price without that offeror's permission. However, the contracting officer may inform an offeror that its price is considered by the Government to be too high, or too low, and reveal the results of the analysis supporting that conclusion. It is also permissible, at the Government's discretion, to indicate to all offerors the cost or price that the Government's price analysis, market research, and other reviews have identified as reasonable (41 U.S.C. 423(h)(1)(2));

§ 15.307(b) The contracting officer may request or allow proposal revisions to clarify and document understandings reached during negotiations. At the conclusion of discussions, each offeror still in the competitive range shall be given an opportunity to submit a final proposal revision. The contracting officer is required to establish a common cut-off date only for receipt of final proposal revisions. Requests for final proposal revisions shall advise offerors that the final proposal revisions shall be in writing and that the Government intends to make award without obtaining further revisions.

48 C.F.R. (FAR) §§ 15.306, 15.307 (1998). Plaintiff maintains that the language in FAR § 15.306(e)(1), and its 1997 revisions [14] that

prohibit favoring one offeror over another, "refute[ ] the Army's contention that it was entitled to receive multiple revised price proposals from and conduct price discussions with only Optex. . . ." Plf's Br. filed Nov. 2, 1998, at 20. In more simple terms, plaintiff contends that the Army violated FAR § 15.306(e)(1) and the spirit of the 1997 revisions by conducting two rounds of price negotiations with intervenor, while conducting only one with plaintiff.

FAR § 1.102–2(c)(3) states that "[a]ll . . . prospective contractors shall be treated fairly and impartially but need not be treated the same." Plaintiff's proposition that the Army must conduct price negotiations with all offerors if it does so with any offeror that has submitted an unreasonably high price overlooks the import of this section. Pursuant to FAR § 15.306(d)(3), the Army "shall . . . discuss with, each offeror still being considered for award, significant weaknesses, deficiencies, and other aspects of its proposal (such as cost, price, . . . ) that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award." Nothing in this provision compels the Army to conduct negotiations with one offeror regarding a weakness perceived in another offeror's proposal. In the instant case, the Army determined that intervenor's proposal was weak in the area of price and that plaintiff's proposal was weak in the area of past performance. Plaintiff's argument, insofar as it is grounded in notions of fundamental fairness, would be stronger if the Army had not afforded plaintiff the opportunity to enhance its proposal prior to the submission of BAFOs. Not only did the Army raise plaintiff's past-performance rating based on promises of future performance, but advised expressly plaintiff in the May 4,

---

**14.** Plaintiff refers to the Final Rule implementing revisions to part 15 of the FAR, which states, in pertinent part:

Expanded exchanges throughout the acquisition process. Some respondents expressed concerns that the increased exchanges between the Government and industry throughout the acquisition process increased the risk of unfair practices. The final rule encourages earlier and more meaningful exchanges of information between the Government and potential contractors to achieve a better understand-

ing of the Government's requirements and the offerors' proposals. This rule contains limits on exchanges that preclude favoring one offeror over another, revealing offerors' technical solutions, revealing prices without the offerors' permission, and knowingly furnishing source selection information. In addition, the guidance in the final rule has been revised to alert contracting officers of the safeguards contained at 3.104, Procurement Integrity, and 24.2, Freedom of Information Act.

62 Fed.Reg. at 51,226 (Sept. 30, 1997).

1998 request for BAFOs that "[a]ny revision to your offer, including price, may be received prior to that time." These facts, when considered in conjunction with the pertinent FAR provision, support a finding that plaintiff was not subject to any unfairness resulting from the Army's price negotiations with intervenor.

The decisions of the Comptroller General on which plaintiff relies do not stand for the proposition that fair treatment among offerors requires that each be treated the same. The critical distinction between the instant matter and *SmithKline*, 93–2 CPD ¶ 79, and *Paramax*, 93–2 CPD ¶ 282, is that *SmithKline* and *Paramax* involve negotiations with one offeror not before, but after, submission of BAFOs. Unlike the period prior to the submission of final proposals during which the Government is encouraged to engage in discussion with offerors for the purpose of addressing and revising weaknesses in each offer, FAR § 15.307(b) states that "[r]equests for final proposal revisions shall advise offerors that the final proposal revisions shall be in writing and that the Government intends to make award without obtaining further revisions." The Army did not conduct

negotiations with intervenor or plaintiff after submission of BAFOs; therefore, the Army by its conduct did not violate FAR § 15.307(b) [15] or come within the restrictions imposed by these decisions.

Decisions of the Comptroller General that do closely parallel the facts of the instant case support intervenor's contention that the Army did not have a duty to discuss price with plaintiff. In *Applied Remote Technology, Inc.*, 93–1 CPD ¶ 58, at 2, the Comptroller General stated that "an agency has no responsibility to inform an offeror that its price is too high unless the government has reason to think that the price is unreasonable." Similarly, in *Telos Corp.*, 98–2 CPD ¶ 30, at 11, the decision stated that "if an offeror's higher cost is not considered excessive ... the higher cost is not a deficiency required to be pointed out during discussions." *See OK's Cascade Co.*, 94–2 CPD ¶ 154, at 8 (explaining that agency need not enter discussions with offeror that submits price considered reasonable). These decisions stand for the general proposition that reasonableness is the touchstone for initiating discussions with an offeror with respect to price.[16]

**15.** Plaintiff also contends that, because Messrs. Balch and Brandenburg did not discuss the terms of intervenor's first revised proposal during the April 24, 1998 telephone call, "the revised proposal could not be a clarification or documentation of any understanding" reached between the Army and intervenor, Plf's Br. filed Nov. 2, 1998, at 22, and, hence, that the Army's receipt of that proposal without conditions constituted a violation of FAR § 15 .307(b). This interpretation is strained. Intervenor submitted a revised proposal in the course of negotiations; the fact that the revised proposal did not reflect the results of any terms discussed between Messrs. Balch and Brandenburg does not render receipt of the proposal a violation of regulation.

**16.** Pressing the argument that all offerors must be given the same number of opportunities to submit revised price proposals, plaintiff, in its reply brief, directed the court's attention to *University of South Carolina*, 90–2 CPD ¶ 249, and *Data General Corp. v. Johnson*, 78 F.3d 1556 (Fed.Cir.1996). Plaintiff asserts that these cases support the "principle that all offerors be given an equal opportunity to revise their proposals ... regardless of whether a BAFO has been requested." Plf's Br. filed Dec. 1, 1998, at 19.

The RFP at issue in *University of South Carolina* indicated that the award decision may be

based on the strength of each offerors' initial proposal. Two offerors, the University of South Carolina ("USC") and CHP International, Inc. ("CHP"), responded to the RFP. After evaluation of submissions, the agency determined that CHP's initial proposal was stronger, and recommended that CHP be awarded the contract, without a request for BAFOs. Before the award was finalized, CHP contacted the agency, entered into discussions with the agency regarding an aspect of its technical proposal, and was permitted to submit a revision. USC then protested the award. The Comptroller General explained that, in this situation, "[t]he conduct of discussion with one offeror generally requires that discussions be conducted with all offerors whose offers are within the competitive range and that the offerors have the opportunity to submit revised offers." *University of South Carolina*, 90–2 CPD ¶ 249, at 2.

The Federal Circuit in *Data General* cited *University of South Carolina* in support of the rule that "[o]nce bidders have submitted their BAFOs, the government may seek 'clarification' of a bid, but cannot engage in 'discussion' with a particular bidder." *Data General*, 78 F.3d at 1561. Plaintiff's reliance on these cases to prove that the distinction before and after BAFO is one without a difference, is misguided. *See* Plf's Br. filed Dec. 1, 1998, at 19. Although *University of*

Plaintiff responds that the Army "cannot justify its failure to conduct price negotiations with MHI by claiming that it considered MHI's price to be reasonable," because the Army "cannot dispute that a price reduction in MHI's proposal would have enhanced its potential for award." Plf's Br. filed Nov. 2, 1998, at 23. To bolster its position, plaintiff contends that FAR § 15.306(d)(3) does not limit discussions to "significant weaknesses" or "deficiencies" of a proposal, but may extend to "other aspects of [an offeror's] proposal (such as cost, price . . .) that could . . . be altered or explained to enhance materially the proposal's potential for award."

Plaintiff does not consider the language of FAR § 15.306(d)(3): "The scope and extent of discussions are a matter of contracting officer judgment." Moreover, plaintiff's assertion that a price reduction in MHI's proposal would have enhanced a potential for award is no more than a tautology. The court finds curious the contention that plaintiff, with its years of successful bidding on government contracts, would be oblivious to the notion that the lower the offering price, the greater the likelihood of award.

■ Plaintiff's remaining concern that the Army violated the FAR by providing intervenor historical pricing data relating to prior contracts awarded for the manufacture and production of Bradley periscopes also lacks merit. FAR § 15.306(e)(3) provides that the Government may not "[r]eveal an offerors price without the offeror's permission. However, the contracting officer may inform an offeror that its price is considered by the Government to be too high, or too low, and reveal the results of the analysis supporting that conclusion." Providing intervenor with publicly available historical pricing does not contravene this provision of the FAR; only if government personnel provided intervenor

with plaintiff's current offering prices would an improper communication have taken place.

In conclusion, as correctly pointed out by intervenor, the "[d]iscovery in this case revealed absolutely nothing improper about the Government's price discussions with Optex." [17] Intvr's Br. filed Nov. 18, 1998, at 32. Plaintiff has not overcome the presumption that government officials act correctly, honestly, and in good faith when evaluating proposals. *See CACI Field Servs.*, 13 Cl.Ct. at 729–730, *aff'd*, 854 F.2d 464. To do so requires a showing of "well-nigh irrefragable proof." *American Gen. Leasing, Inc. v. United States*, 218 Ct.Cl. 367, 374, 587 F.2d 54, 59 (1978). In the absence of the required showing, and considering plaintiff's inability to identify an instance of abuse of discretion on the part of any government personnel throughout pre-award negotiations, the court is not in a position to disturb the Army's award decision. The unfortunate reality confronting plaintiff is that, if an agency initiates discussion with another offeror on price, regardless of the reasonableness of that price, a substantial likelihood exists that the price will be reduced. It appears that the FAR, even in its current formulation, fails to appreciate the practical effect upon business judgment attendant to negotiations with respect to price that may not necessarily be present in negotiations on, *e.g.*, past performance or technical criteria. This area of concern notwithstanding, no basis is present in the record before the court to declare any provision of the FAR unlawful or to find the actions of the Army arbitrary or capricious.

### 2) *Remarks by the Army to plaintiff*

In its verified complaint, plaintiff alleged that the Army gave unfair and improper

---

*South Carolina* did not address discussions after BAFO, it did address the propriety of discussions after the *submission of initial proposals*, which, in that case, were tantamount to BAFOs. This interpretation is consistent with the manner in which the Federal Circuit incorporated *University of South Carolina* into its analysis of the rights of offerors after BAFO. It should be noted that both of these decisions issued before the 1997 amendments to the FAR.

17. Despite plaintiff's inability to direct the court's attention to any improper communication between intervenor and the Army, the court acknowledges the dramatic reductions in intervenor's bid price across the course of negotiations. Plaintiff finds the explanation for these reductions unconvincing. The sincerity or extent of plaintiff's conviction regarding the presence of bias, however, does not bear upon the lack of evidence suggestive of an impermissible communication between the Army and intervenor.

preferential treatment to intervenor based, in part, on alleged remarks made by Army Contract Specialist Brandenburg to plaintiff's president, Mr. Campolo. These alleged remarks were uttered moments after the April 28, 1998 pre-award meeting during which plaintiff and the Army discussed the possibility of elevating plaintiff's past-performance rating. Plaintiff claims that Mr. Brandenburg escorted Mr. Campolo into the lobby of the building in which this meeting occurred, at which time Mr. Brandenburg made certain statements regarding plaintiff's prices for its base CLINs and option CLINs. Plaintiff's Verified Complaint for Declaratory and Injunctive Relief, filed July 14, 1998, contains the following averments:

28. While instructing Optex on how to lower its prices, Contract Specialist Brandenburg advised MHI's President following a meeting at ACALA's offices on April 28, 1998, that there was no need to change MHI's proposed prices for the Basic CLINs. On information and belief, Mr. Brandenburg now denies that he discussed the subject of price with MHI's President or that he ever led MHI not to change its prices for the Basic CLINs.

. . . .

37. The only area where Optex's final price was lower than MHI's prices was for the Basic CLINs. This is the specific area where Contract Specialist Brandenburg had led MHI not to change the prices in its initial proposal. If MHI had lowered its final prices for the Basic CLINs by the same percentage that it lowered its final prices for the Option CLINs and FAT CLINs, MHI would have had lower final prices than Optex in this area as well.

. . . .

60. . . . During the same period when the Army alerted Optex to the need to reduce its prices (and by how much), the Army's Contract Specialist led MHI not to reduce its prices for the Basic CLINs. . . .

On July 10, 1998, Mr. Campolo executed a declaration that was filed as an exhibit in support of plaintiff's motion for a Temporary Restraining Order and/or Preliminary Injunction, filed July 20, 1998. Mr. Campolo in several instances refers to the Army's "illegal" award to Optex, and ultimately concludes that, if allowed to stand, the award would cause irreparable harm to plaintiff. *See* Declaration of Francis J. Campolo, July 10, 1998, ¶ 14. After the court denied plaintiff's application for preliminary and injunctive relief in an order issued July 22, 1998, defendant filed its answer to plaintiff's complaint, in which it pleaded that "Mr. Brandenburg denies having told MHI's President there was no need to change MHI's proposed prices for Basic CLINs." Answer filed July 24, 1998, at ¶ 28.

On August 13, 1998, defendant filed a motion for a Protective Order Quashing Certain Discovery regarding, *inter alia*, plaintiff's allegation that Mr. Brandenburg told plaintiff not to lower its price. Consistent with the position outlined in its Verified Complaint, plaintiff's opposition brief reiterates the claim that Mr. Brandenburg misled MHI during the discussion process. Mr. Campolo executed a second declaration on August 17, 1998, in which he stated:

5. As the April 28 meeting came to a close, Mr. Brandenburg offered to escort me to the lobby. We stopped in the lobby where Mr. Brandenburg raised the issue of MHI's prices. Neither Ms. Allison–Hiebert nor Mr. Holmgren were present in the lobby. There was an individual whom I did not recognize, and whom I assume was there on other business, standing to one side of the lobby. In the lobby, Mr. Brandenburg stated openly that MHI's prices for the Base CLINs were "okay," suggesting that there was no need for MHI to change the prices for the base CLINs at best and final offer ("BAFO").

6. Shortly after this discussion, I made calls to two colleagues about Mr. Brandenburg's comments about pricing—one to an outside company consultant named Vincent Cervellieri and the other to my attorney, David Hazelton. Prior to the filing of this lawsuit, I confirmed my recollection with these two individuals of what I had told them about Mr. Brandenburg's comments and Mr. Cervellieri has signed a declaration attesting to the fact that I informed him of this conversation.

7. In its BAFO, MHI did not change its prices for Basic Quantities. It did reduce its prices, as typical at BAFO, for Option CLINs and FAT CLINs.

The court entered an order on August 20, 1998, permitting plaintiff to question Mr. Brandenburg about his affidavit incorporated into the administrative record and to pursue written discovery consistent with the protective order filed on July 22, 1998.

Plaintiff filed its motion for summary judgment on November 2, 1998. In its statement of uncontroverted facts, filed simultaneously, plaintiff continued to advance the argument that Mr. Brandenburg's remarks to Mr. Campolo effected a comparative disadvantage upon plaintiff concerning the issue of price:

47. To the extent that the Army did discuss price with MHI, it affirmatively misled MHI not to reduce its price for the Base CLINs. Frank Campolo, President of MHI, testified that Mr. Brandenburg told him on April 28, 1998 that his base year prices were "okay" and that he should decrease the annual increases in the option years by half. Mr. Campolo did not solicit these comments in any way.

48. Mr. Brandenburg's comments were misleading and not helpful to MHI because it would not have had any effect on the relative standing of the offerors at the time it was made. One offeror's price was sufficiently low that the comments would not have affected MHI's standing with respect to that offeror. Optex's price was so high at the time that the comment would not have improved MHI's position. The comment could only have had the effect of keeping MHI's base year prices the same at BAFO. Had MHI lowered its base year prices by the same percentage that it lowered its option year prices, it would have had a lower price at BAFO than Optex.

Plf's Statement of Uncontroverted Fact, filed Nov. 2, 1998, ¶¶ 47–48 (citations omitted).

In preparation for their cross motions, defendant and intervenor deposed Mr. Campolo on October 21, 1998. Particularly pertinent portions of his testimony follow:

Q Paragraph five of your declaration filed in this case states that you and Mr. Brandenburg stopped in the lobby where you said Mr. Brandenburg raised the issue of Miller–Holzwarth prices. How did he raise that issue?

A Mr. Brandenburg as we were saying goodbye made reference to our pricing.

Q What exactly did Mr. Brandenburg say?

A That our prices were okay. That the option year prices were too high and we ought to reduce the amount of increase, as I recall cutting it by half or 50 percent.

. . . .

Q So you didn't see anything improper about him telling you that?

A No, I don't think I felt that it was improper, although I did raise a question with the lawyer about it. It's not for me to determine whether those kinds of actions are proper or improper. It's for somebody else to advise me on that.

Q Well, you apparently thought the statement was very significant in view of the allegations you made in this lawsuit. I'm just trying to ascertain what significance you placed on the statement that made you think it was so important.

[Ms. Vu]: Objection to the form of the question. I don't believe that was a question.

[By Mr. Doke]: Q Did you understand the question, Mr. Campolo?

A No.

Q You must have thought the statement was particularly significant because you made it a substantial portion of this lawsuit. And I'm just asking you what about the statement made you think it was significant?

A The manner in which the statement was made and followed by his retraction after I left the building and the fact that that information was of some concern to me.

Q You first said the manner in which he made the statement. Describe the manner in which he made the statement.

A As we were leaving he, you know, as I recall, I probably went to shake hands with

the man to say goodbye and he blurted out the comment that we are talking about.

Q He blurted out just saying, "Frank, your prices are okay." Is that what your testimony is?

A That's correct.

Q Your base prices?

A Base prices are okay. Your option prices percentages are too high. You ought to cut them in half. Whatever it was that was in the declaration. I don't want to, you know, since this is on the record, I don't want to go back and try to recite verbatim what I have already put down in writing.

Q Well, is your memory not as good now as it was when you made the declaration?

A No, I don't think so.

Q You think your memory is not as good as it was then.

A No, I think my memory is as good now as it was then. It is just a question of the declaration is the declaration.

Q Well, I'm asking you for your testimony today.

A Yes, sir.

Q What your recollection is.

A My recollection is that he blurted out the comment relative to price as I left the building.

Q And you thought the manner of that was unusual or strange or what? What was your reaction?

A I thought it was unusual because it was after we had concluded the meeting, and specifically the meeting was held for discussion purposes and that his boss and the lawyer was there. So I thought it was unusual that since he didn't raise the subject of price in the meeting he raised it in the lobby.

Q Now you further testified that the statement was followed by a retraction after you left the building. Explain that.

A Yeah, as I was leaving the building, when I was going down the steps outside the building, Mr. Brandenburg came out and said something to the effect I didn't say that, and then he returned into the building.

Q What was your reaction to that comment?

A I thought it was strange.

Q Did you think he believed it was improper to have made the statement?

A I don't know what he believed. I know what he said.

Q Well, what did you believe he meant when he said it other than those words? Did you have any understanding other than he denied it?

A My understanding was that he said he would deny it.

Deposition of Francis J. Campolo, Oct. 21, 1998, at 56–57, 62–65.

Mr. Campolo testified that he was influenced by the information allegedly provided by Mr. Brandenburg, and that the information "was a factor in determining the final prices submitted in the proposal." *Id.* at 100. Intervenor then pressed Mr. Campolo to clarify the content of his sworn declaration by recalling specifically what was stated between him and Mr. Brandenburg.

[Mr. Campolo] That declaration was drafted by Latham and Watkins and I relied on Latham and Watkins to draft the declaration.

. . . .

Q . . . . Is your testimony now that you don't recall specifically . . . hearing the words basic CLINs?

A That's correct.

Q Can you explain then why that's in your sworn declaration?

A I thought the—the issue is, again as I stated, that document was drafted by the law firm after we had discussions pertaining to that complaint and I relied on my lawyer to draft that document based upon his judgment.

Q Would you like to take those words out of the document right now, Mr. Campolo? Would you like to correct your declaration right now?

A If we are going to correct the declaration, then I will rely on Latham and Watkins to tell me that's what is appropriate.

If it's appropriate, then we can correct the declaration at this point.

*Id.* at 169–70. By the time plaintiff filed its reply brief, it had retreated from the allegations surrounding the conversation as a basis for any theory of recovery, stating plainly that, "MHI does not rely on the conversation for its motion." Plf's Br. filed Dec. 11, 1998, at 30–31. Plaintiff's reply contends further that Mr. Campolo did not interpret "Mr. Brandenburg's remark to mean that his base price was the lowest," and, ultimately, that "there was nothing illicit about the conversation." *Id.* at 32–33.

From the outset of this lawsuit, defendant has insisted that the facts uncovered in discovery constitute "compelling evidence that Mr. Brandenburg said nothing to Mr. Campolo about price in their conversation." Def's Br. filed Nov. 18, 1998, at 22. Although plaintiff explained at argument that it was not pressing the Brandenburg remarks because their substance was disputed, *see* Plf's Response to Intervenor's Proposed Findings, filed Dec. 1, 1998, ¶¶ 65–75, and the issue was not amenable to resolution on summary judgment, plaintiff's decision to retrench from an allegation so substantial a part of its complaint is likely the result of intervenor's assertion that plaintiff's motion should be denied based on the equitable doctrine of "unclean hands." The principal ground of intervenor's cross-motion is that plaintiff violated the Procurement Integrity Act, 41 U.S.C. § 423(b) (Supp.1998),[18] because plaintiff attempted to use source selection information to gain an unfair advantage over its competitors.

Because the statements made during this conversation remain in total dispute and, further, because plaintiff has retreated from its original allegation, the court cannot resolve the issues attendant to the exchange between Messrs. Brandenburg and Campolo on cross-motions for summary judgment. The record is further befogged by the fact that plaintiff and defendant filed a stipulation to the following effect: "The Army did not engage in price negotiations with MHI in connection with the Solicitation. MHI submitted one revised price proposal, which was submitted on May 8, 1998, in response to the Army's request for best and final offers." Stipulations filed July 24, 1998, ¶ 8.

This dispute is not material to the resolution of the matter pending before the court. If plaintiff, in fact, did obtain and rely on such information for its BAFO, plaintiff is left with unclean hands and precluded from recovery in equity. *See Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.,* 324 U.S. 806, 814–15, 65 S.Ct. 993, 89 L.Ed. 1381 (1945). Alternatively, if plaintiff did not obtain or rely on improperly communicated source-selection information, plaintiff's allegations, to the extent that they already have not been discounted in plaintiff's own moving papers, do not meaningfully advance its position. The court, however, cannot pyramid upon the former assumption a finding of unclean hands. The consequences of such a finding could be so dire to plaintiff that the court would not make it without holding an evidentiary proceeding to ascertain the facts. Nonetheless, the court would be remiss in failing to caution against the propriety of launching four months of discovery in a bid protest, which was predicated largely on alleged actionable remarks of government personnel. At a minimum, plaintiff's bona fides are suspect.

### 3. Waiver of First Article Testing

■ For its final argument, plaintiff contends that the Army's decision to waive FAT for intervenor was arbitrary, contrary to the past practice, and prejudicial to plaintiff. If FAT had not been waived for intervenor, plaintiff asserts that its offering price would have been lower than that of intervenor and, thus, that plaintiff would have been awarded the contract. Defendant and intervenor rejoin that plaintiff is merely attempting to substitute its own judgment for that of the Army, and that the Army's decision to waive FAT for intervenor was in accord with the

---

18. 41 U.S.C.A. § 423(b) (West Supp.1998), states, in pertinent part:

A person shall not, other than as provided by law, knowingly obtain contractor bid or proposal information or source selection information before the award of a Federal agency procurement contract to which the information relates.

terms of the solicitation and consonant with current trends in acquisition reform.

Incorporated directly into the solicitation, the following paragraphs govern the circumstances under which the Government may waive FAT for an offeror:

I–8 First Article Approval–Contractor Testing, Alternate I and Alternate II 52.209–3

. . . .

(h) The Government may waive the requirement for first article approval test where supplies identical or similar to those called for in the schedule have been previously furnished by the Offeror/Contractor and have been accepted by the Government. The Offeror/Contractor may request a waiver.

. . . .

L–5 Waiver of First Article Approval 9.306(c) FAR

This procurement is subject to first article approval tests. Offers are invited on the basis of "with first article" and "without first article approval." The fact that an offeror has previously furnished the item does not necessarily mean the first article will be waived. Any waiver of first article is subject to a renewed requirement when any of the conditions described in section E paragraph entitled "instruction regarding submission of first article" occurs.

The Government reserves the right to waive the requirements for first article approval testing where supplies identical or similar to those called for in the schedule have been previously furnished by the offeror and have been accepted by the Government. . . .

William Dunn, Army Quality Assurance Specialist, provided ample and persuasive support in his affidavit for the decision to waive FAT for intervenor. From April 1997 to November 4, 1997, intervenor was engaged in performing first article testing for the Abrams contract. Mr. Dunn observed on site portions of this testing. The affidavit discloses that Mr. Dunn considered the Bradley periscope to be "similar," as defined in the solicitation, to the Abrams periscope. In addition, Mr. Dunn stated that the Bradley periscope is simpler to manufacture than the Abrams periscope and that, as a result, a successful producer of the Abrams would find production of the Bradley much simpler than production of the Abrams. In short, Mr. Dunn formed his opinion "based on the fact that the same processes and procedures used in manufacturing the Bradley periscopes are used while manufacturing the Abrams periscope." Affidavit of William John Dunn, Jr., July 1, 1998, at 4.

Plaintiff "does not agree with this simplistic conclusion," that the Abrams periscope is similar but more difficult to manufacture than the Bradley. Plf's Br. filed Nov. 2, 1998, at 24. Plaintiff points out that Mr. Dunn could not recall a single instance in his 19–year Army career when he recommended a waiver of FAT for a contractor that had not manufactured the specific item called for by the contract. Mr. Dunn explained that a contractor would be required to conduct FAT for a periscope that it had produced before if the contractor moved to a different facility or experienced a lapse in production. Mr. Dunn also testified that his decision was based in part on two assumptions: First, that intervenor, if awarded the contract, would use the same production line for the Bradley as it did for the Abrams, and second, that intervenor would rely on the same workforce. Plaintiff asserts that, if FAT would be imposed on a contractor that had manufactured the item specifically called for in the contract under the foregoing circumstances, the Army should not grant a waiver of FAT for intervenor, a contractor that had never produced the item called for by the instant solicitation.

 In light of Mr. Dunn's extensive experience, which includes at least 50 FAT determinations personally rendered within the last five years, it is peculiar that he granted intervenor a waiver despite intervenor's uncontested lack of manufacturing experience for the Bradley periscope. However, Mr. Dunn's explanation is grounded in the terms of the solicitation and does not lack a rational, factual basis, as plaintiff suggests. An agency's decision to waive FAT for a particular offeror is subject to question only where it is shown to be arbitrary, capricious,

or unreasonable. *See Comdyne I, Inc.*, 88–2 CPD ¶ 611, at 3; *Baird Corp.*, 84–1 CPD ¶ 8, at 2. Contracting agencies are vested with the responsibility of determining the amount of testing necessary to assure specification compliance. *See Modular Devices, Inc.*, 75–2 CPD ¶ 119, at 2. Moreover, this is not the first instance in which FAT was waived based on the manufacture of a "similar" product. *See Roadmaster Trailers Unlimited, Inc.*, 90–1 CPD ¶ 34, at 2; *see also J.A. Jones Constr. Co.*, 85–2 CPD ¶ 637, at 2 (explaining that determination of what is "similar" is within agency discretion). Mr. Dunn's decision gives less affront when considered in the context of the Government's recent focus on acquisition reform and attempts to streamline the procurement process.[19]

### III. *Other showings for injunctive relief*

In addition to demonstrating the presence of an unreasonable action or violation of an applicable procurement statute or regulation, plaintiff must make three additional showings: 1) that failure to enjoin the procurement will cause plaintiff to suffer specific and irreparable harm; 2) that such harm to plaintiff outweighs that which would be incurred by the Government and third parties should plaintiff prevail; and 3) that the grant of injunctive relief is in the public interest. *See Logicon*, 22 Cl.Ct. at 795. The court incorporates its findings on point in the July 22, 1998 order.

### CONCLUSION

Accordingly, based on the foregoing,

**IT IS ORDERED,** as follows:

1. Plaintiff's motion for summary judgment is denied, and defendant's and intervenor's cross-motions are granted. The Clerk of the Court shall enter judgment for defendant and intervenor.

2. By December 28, 1998, the parties shall file requests for deletion of protected/privileged material before the court issues its published opinion.

---

**19.** All of plaintiff's arguments that are not addressed specifically have been evaluated carefully and are rejected.

3. Costs to both defendant and intervenor.